This case involves an appeal and cross-appeal from the trial court's order granting the City of Gadsden a new trial, conditioned upon the plaintiff's refusal to accept a remittitur of damages.
Prior to 1980, employees of the City of Gadsden were insured for hospitalization, major medical, short-term disability, and life insurance coverage through General American Life Insurance Company. The plan provided conversion privileges for employees to continue participation in the program after retirement. The plan also provided conversion privileges for the retiree's spouse upon the death of the retiree, if the surviving spouse was covered by the plan at the time of the death.
In June 1980, the city changed to a self-funded employee benefit plan administered by Marketing Management Administrator Associates and a local agency, Red Leach Son Insurance. The plan did include *Page 1375 
conversion privileges for retirees "on an individual basis," but dropped the privilege for the surviving spouse. The plan booklet stated: "There are no other conversion privileges underthe Plan." (Emphasis in original.) The plan remained in effect until September 1, 1983, when Blue Cross-Blue Shield became the administrator. The Blue Cross-Blue Shield plan reinstated conversion privileges for surviving spouses.
Kathryn Hammond's husband, J. Curtis Hammond, worked for the city water works and sewer board until he retired in 1973. Both he and his wife were covered by the city insurance plan. Around June 1980, Mr. Hammond received a letter from the Gadsden City Commission, discussing the transfer to the self-funded plan. Addressed to all retirees, the letter stated:
"There are no changes in your existing benefits —
 "There is complete continuity between the old and new plans —. . . .
 "From your viewpoint, it's just as though there hadn't been a change. . . ." (Emphasis in original.)
Mr. Hammond continued to pay monthly premiums for coverage until his death on September 18, 1981. When Mrs. Hammond and her son, Richmond, went to the Leach Agency to collect life insurance benefits, Mrs. Hammond learned for the first time that she would be covered under the plan for one year from the date of her husband's death and would not have to pay any premiums during that one-year period. However, she also learned that, upon the expiration of the one-year period, she would be dropped from the plan.
On December 3, 1981, the Hammonds met with Gadsden Mayor Steve Means, a friend of her son, to discuss the possibility of Mrs. Hammond's continuing under the city's group coverage beyond the one-year period. Mrs. Hammond was concerned that she might not be able to get any insurance coverage because of her past medical history. Mayor Means testified:
 "I expressed some concern about Mrs. Hammond's situation and I was very anxious to try to help her out if I possibly could. I could understand the dilemma of someone who was just a couple of years away from being eligible for Medicare, that due to their age and this particular gap between that age and being eligible for Medicare that it would be very difficult to get other insurance. . . . I indicated to Mrs. Hammond that I would look into it to see if there was anything that might possibly be done to help her out."
On January 4, 1982, Mayor Means wrote a letter to Richmond Hammond, stating:
 "I'm still working on this and have just today spoken with our insurance carrier. I don't have any idea whether or not I'll be able to work anything out, but I did want you to know I was trying my best. I will keep you informed as things develop."
According to Richmond Hammond, he and his mother had several more discussions with the mayor during the year.
In October 1982, Mayor Means sent a note to the Hammonds thanking them for their get-well card to him. His note included a postscript: "I think about you often. Did you ever work anything out on your insurance matter?"
Mrs. Hammond testified that Mayor Means also told her son to inquire about separate insurance with the Leach Agency. On November 1, 1982, Mrs. Hammond paid $82.77 for an insurance policy but was informed in April 1983 that the insurance company had rejected her application. Leach refunded the premium payment, with a letter stating that the agency would continue its attempts to find hospitalization coverage for Mrs. Hammond. A copy of the letter was sent to Mayor Means.
Mrs. Hammond met again with the mayor in April or May 1983, and once more on November 1, 1983. Jan Veal, director of loss control for the city, attended the latter meeting "to talk about her situation and to see if I knew of anyone with my insurance contacts that could find her some sort of coverage." Veal made a number of calls and told Mrs. Hammond of several *Page 1376 
possibilities with local agents. Veal encouraged Mrs. Hammond to contact these agents directly.
Sometime around early 1984, Mrs. Hammond called Veal again, stating that she still had not found coverage and that she was upset with Veal's efforts. Veal explained that "we had done all we could do."
Mrs. Hammond filed this action against the city and the water works and sewer board on May 14, 1984, alleging fraud, breach of contract, and negligence. She alleged that the city commission's letter contained misrepresentations by stating that the change in insurers in June 1980 resulted in no changes in the insurance program. In addition to a general denial, the city and the board raised the affirmative defense of statute of limitations. The trial court granted the defendants' motion for directed verdict on the contract and negligence courts, but the fraud and statute-of-limitations issues were submitted to the jury. The jury returned a verdict of $12,000 for Mrs. Hammond. In response to the city's motion for judgment notwithstanding the verdict (JNOV) or, alternatively, for a new trial, the trial court ordered a new trial unless Mrs. Hammond filed a remittitur of that portion of the verdict in excess of $2,000. Both sides appealed to this Court.
The parties raise several issues, which will be discussed in turn. However, a review of the appropriate standards of appellate review is useful here. A motion for directed verdict or JNOV is tested against the scintilla rule, which requires that a question go to the jury "if the evidence or any reasonable inference arising therefrom, furnishes a mere gleam, glimmer, spark, the least particle, the smallest trace, or a scintilla in support of the theory of the complaint." AlabamaPower Co. v. Taylor, 293 Ala. 484, 306 So.2d 236 (1975). In reviewing a trial court's ruling on these motions, the appellate court, guided by the standard of the scintilla rule, determines whether there was sufficient evidence below to produce a conflict warranting jury consideration. Baker v.Chastain, 389 So.2d 932 (Ala. 1980). Like the trial court, the appellate court must view all the evidence in a light most favorable to the nonmoving party. Ritch v. Waldrop, 428 So.2d 1
(Ala. 1982).
In reviewing a trial court's ruling on a new trial motion, based on the weight and preponderance of the evidence, the standard of review guiding the appellate court is whether the trial court abused its discretion in disposing of the motion.Pepsi-Cola Bottling Co. v. Colonial Sugars, a Division ofBorden, Inc., 423 So.2d 190 (Ala. 1982). The trial court's decision will not be overturned on appeal unless the evidence "plainly and palpably" shows that the trial court erred in ruling on the motion for new trial. Herrington v. Central SoyaCo., 420 So.2d 1 (Ala. 1982). The appellate court must view the tendencies of the evidence most favorably to the non-moving party and must indulge such inferences as the jury was free to draw. Cooper v. Peturis, 384 So.2d 1087 (Ala. 1980).
In their motions for JNOV or new trial, the city and the board contended that Hammond's claim was barred by the statute of limitations for fraud. An action for fraud must be "commenced within one year." Code 1975, § 6-2-39 (5).[1] However, the running of the statute does not commence until discovery of the fact constituting the fraud or discovery of facts which would provoke inquiry in the mind of a reasonable and prudent person, and which, if followed up, would lead to the discovery of fraud. Code 1975, § 6-2-3; Papastefan v. B L ConstructionCo., 356 So.2d 158 (Ala. 1978).
In some cases, however, a party may be estopped to assert the statute-of-limitations defense. In Ex parte Youngblood,413 So.2d 1146 (Ala. 1981), this Court stated:
 "The representations of an employer or its insurance carrier may be such as to *Page 1377 
estop them from asserting the statute of limitations as a bar to a claim for workmen's compensation, if the employer or the carrier, or their representatives, in their dealings with the claimant, conduct themselves in such a manner, whether innocently or fraudulently, as to mislead the claimant into believing that he can postpone the filing of his claim until the period of limitation has expired. Whether the employer or the carrier, or their representatives were primarily responsible for the delay is a fact question for the factfinder at the trial level."
413 So.2d at 1149. Delay in bringing an action caused by representations by a party on several occasions that it would attempt to resolve the underlying dispute may be sufficient to constitute estoppel. Mason v. County of Mobile, 410 So.2d 19
(Ala. 1982). The conduct must amount to an affirmative inducement to the claimant to delay bringing an action. Seyboldv. Magnolia Land Co., 376 So.2d 1083 (Ala. 1979). Vague assurances such as "we'll see what can be done" fall short of the affirmative inducement required to estop a pleading of the statute. Seybold, supra, at 1085.
Mrs. Hammond admits that she became aware of the alleged misrepresentations concerning conversion privileges several years before she filed this action in May 1984. However, she contends that the city and the board are estopped from pleading the statute of limitations because they affirmatively induced her not to file suit. This question of estoppel was submitted to the jury, which returned a verdict favorable to Mrs. Hammond. Although it is a close question, by viewing the evidence in a light most favorable to Mrs. Hammond, we find at least a scintilla of evidence in the record to let the jury decision on this issue stand.
The second issue is whether there was sufficient evidence on the fraud claim to prevail against the defendants' motions for directed verdict, JNOV, and a new trial. According to Code 1975, § 6-5-101:
 "Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud."
Regardless of whether the representations were made willfully, recklessly, or mistakenly, it has been held: (1) that there must be a false representation; (2) that the false representation must concern a material existing fact; (3) that the plaintiff must rely upon the false representation; and (4) that the plaintiff must be damaged as a proximate result.International Resorts, Inc. v. Lambert, 350 So.2d 391 (Ala. 1977).
A fraud claim may be based also on concealment:
 "Suppression of a material fact which the party is under an obligation to communicate constitutes legal fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case."
Code 1975, § 6-5-102. Unless confidential relations or special circumstances exist, mere silence is not fraud; in such a case, there must be active concealment or misrepresentation. Berkel Co. Contractors v. Providence Hospital, 454 So.2d 496 (Ala. 1984).
In this case, the fraud issue centers solely on the letter sent by the Gadsden City Commission to retirees, stating that the change in insurers in June 1980 resulted in no changes in benefits to program participants. (The statements by Mayor Means and other city employees relate only to the issue of estoppel discussed above.) Specifically, the letter stated: "There are no changes in your existing benefits — There is complete continuity between the old and new plans —. . . . From your viewpoint, it's just as though there hadn't been a change. . . ." From the facts in the record, the jury had ample evidence to conclude that the city recklessly or mistakenly misrepresented the material fact that the June 1980 insurance program did contain changes in conversion privileges, which were quite important to the retirees. The trial court acted properly in denying the *Page 1378 
motions for directed verdict and JNOV and in conditionally denying the new trial motion.
The third issue is whether the trial court acted properly in ordering Mrs. Hammond to remit all but $2,000 of her $12,000 jury verdict as a condition for denying the defendants' motion for a new trial. The trial court may not substitute its own judgment for that of the jury in determining whether to grant a remittitur. Central of Georgia Railway Co. v. Steed, 287 Ala. 64, 248 So.2d 110 (1971). The authority to disturb a jury verdict on the ground of excessive damages is one which should be exercised with great caution. Airheart v. Green, 267 Ala. 689, 104 So.2d 687 (1958). However, a remittitur may be ordered in those cases where the court can clearly see that the verdict has been reached because of bias, passion, prejudice, corruption, or other improper motives. Aspinwall v. Gowens,405 So.2d 134 (Ala. 1981). This Court is well aware that the trial court is in a better position to observe all the witnesses who testified and other incidents which are not reflected in the record. Holcombe v. Whitaker, 294 Ala. 430, 318 So.2d 289
(1975).
In this case, Mrs. Hammond claimed damages for her medical expenses and mental anguish. The undisputed evidence shows that she incurred $4,829.97 in medical expenses during the period from September 1982, when the city's coverage expired, until May 15, 1985, when this action was tried. If she had continued on the city's plan, but had paid her own premiums, the city estimates that the cost of the premiums to her would have been somewhere between $2,624 and $4,118 for the same period, depending on the particular insurer. (None of the city's successive insurance programs provided 100% coverage for all claims.) The jury returned a verdict of $12,000. The trial court ordered a remittitur of all but $2,000 without an explanation for its arriving at this particular sum. Thus, we are again asked to review a trial court order which has reduced a jury verdict without any explanation of the criteria utilized in doing so. In General Motors Corp. v. Edwards, 482 So.2d 1176
(Ala. 1985), when similarly situated, a majority of the Court expressed its discomfort with deciding the propriety of trial court action without any established standards for the trial court's guidance and suggested that our Advisory Committee on Rules of Civil Procedure be called upon to suggest appropriate standards. Further deliberation has convinced us that the responsibility to adopt standards lies with this Court.
We begin by recognizing that the right to a trial by jury is a fundamental, constitutionally guaranteed right, Art. I, § 11, Const. of 1901, and, therefore, that a jury verdict may not be set aside unless the verdict is flawed, thereby losing its constitutional protection. It is only in those cases that a trial court, pursuant to A.R.Civ.P. 59 (f), and this Court, pursuant to Code 1975, § 12-22-71, may interfere with a jury verdict. Insofar as damages are concerned, a jury verdict may be flawed in two ways. First, it may include or exclude a sum which is clearly recoverable or not as a matter of law, or which is totally unsupported by the evidence, where there is an exact standard or rule of law that makes the damages legally and mathematically ascertainable at a precise figure. In these situations, a trial court may, and should, reduce or increase the amount of the verdict to reflect the amount to which the parties are entitled as a matter of law. Second, a jury verdict may be flawed because it results, not from the evidence and applicable law, but from bias, passion, prejudice, corruption, or other improper motive. It is this category of cases that most troubles both trial and appellate courts.
The cases have consistently held that in deciding whether a jury verdict is excessive because it is the result of passion, bias, corruption, or other improper motive, a trial judge may not substitute his judgment for that of the jury. B M Homes,Inc. v. Hogan, 376 So.2d 667 (Ala. 1979); Vest v. Gay, 275 Ala. 286, 154 So.2d 297 (1963). We have also recognized that the trial judge is better positioned to decide *Page 1379 
whether the verdict is so flawed. He has the advantage of observing all of the parties to the trial — plaintiff and defendant and their respective attorneys, as well as the jury and its reaction to all of the others. There are many facets of a trial that can never be captured in a record, so that the appellate courts are at a special disadvantage when they are called upon to review trial court action in this sensitive area, although increasingly they are required to do so. Therefore, it is not only appropriate, but indeed our duty, to require the trial courts to reflect in the record the reasons for interfering with a jury verdict, or refusing to do so, on grounds of excessiveness of the damages.
Our cases reflect a number of factors which are appropriate for the trial court's consideration: The culpability of the defendant's conduct, Ridout's-Brown Service, Inc. v. Holloway,397 So.2d 125 (Ala. 1981); the desirability of discouraging others from similar conduct, Ford Motor Credit Co. v.Washington, 420 So.2d 14 (Ala. 1982); the impact upon the parties, Alabama Power Co. v. Hussey, 291 Ala. 586,285 So.2d 92 (1973). These are by no means exclusive. Justice may well require consideration of other factors, such as the impact on innocent third parties. We make no attempt to enumerate all of the factors which may be considered by the trial court. We instead leave that to its sound discretion. We do emphasize, however, that only where the record establishes that the award is excessive or inadequate as a matter of law, or where it is established and reflected in the record that the verdict is based upon bias, passion, corruption, or other improper motive may a trial court order a new trial or remittitur. Only by requiring that a record be made can this Court adequately discharge its role of appellate review of trial court action in either granting or refusing to grant a new trial where remittitur is granted or denied.
In adopting this new procedure, we emphasize that no substantial rule of law is changed. A trial court may not conditionally reduce a jury verdict merely because it believes the verdict overcompensates the plaintiff; B M Homes, Inc. v.Hogan, 376 So.2d 667 (Ala. 1979); Vest v. Gay, 275 Ala. 286,154 So.2d 297 (1963); nor may the trial court substitute its judgment for that of the jury. We also reaffirm those cases which hold that, in considering the adequacy or excessiveness of a verdict, there can be no ironclad rule, and each case must be determined by its own facts. Williams v. Williams, 283 Ala. 292, 216 So.2d 181 (1968).
We simply now require the trial courts to state for the record the factors considered in either granting or denying a motion for new trial based upon the alleged excessiveness or inadequacy of a jury verdict. We know of no other way by which this Court can discharge fairly its role of review.
Accordingly, the trial court's conditional order of a new trial is reversed and the cause remanded for entry of an order consistent with this opinion.
REVERSED AND REMANDED.
All the Justices concur.
[1] Effective January 9, 1985, the statute of limitations provides a two-year limit for fraud actions. Code 1975, §6-2-38 (1), amended 1985; Act 85-39, § 1, Alabama Acts Second Special Session 1984-85.