570 So.2d 578 (1990)
LAWYERS TITLE INSURANCE CORPORATION
v.
John H. VELLA and Elizabeth Ann Vella.
ROBERTS BROTHERS, INC.
v.
John H. VELLA and Elizabeth Ann Vella.
John H. VELLA and Elizabeth Ann Vella
v.
LAWYERS TITLE INSURANCE CORPORATION and Realty Title Company.
REALTY TITLE COMPANY
v.
John H. VELLA and Elizabeth Ann Vella.
88-400, 88-401, 88-402 and 88-403.
Supreme Court of Alabama.
August 10, 1990.
Rehearing Denied November 16, 1990.
*579 Robert E. Clute, Jr. and Barry L. Thompson of Silver & Voit, Mobile, for appellant/cross-appellee Lawyers Title Ins. Corp.
A. Danner Frazer, Jr. and William H. Philpot, Jr. of Armbrecht, Jackson, DeMouy, Crowe, Holmes & Reeves, Mobile, for appellant Roberts Bros., Inc.
Vincent F. Kilborn, Mobile, for appellant/cross-appellees John H. & Elizabeth Ann Vella.
Irvin J. Langford of Howell, Johnston, Langford & Watters, Mobile, for appellant/cross-appellee Realty Title Co.
John E. Pilcher of Pilcher & Pilcher, Selma, for amicus curiae First American Title Ins. Co. in support of application for rehearing.
Jesse P. Evans, III and Walter F. McArdle of Najjar, Denaburg, Meyerson, Zarzaur, Max, Wright & Schwartz, Birmingham, for amicus curiae Ticor Title Ins. Co. in support of application for rehearing.
*580 KENNEDY, Justice.
The defendantsRoberts Brothers, Inc. ("Roberts"), Realty Title Company ("Realty"), and Lawyers Title Insurance Corporation ("Lawyers")appeal from a judgment entered on a jury verdict in favor of the plaintiffs, John H. Vella and Elizabeth Ann Vella. The jury awarded the Vellas compensatory damages in the amount of $100,000 against all defendants and assessed punitive damages in the amount of $275,000 against Realty and Lawyers on a claim of reckless misrepresentation. The trial court granted Realty and Lawyers' motion for judgment notwithstanding the verdict on the claim for punitive damages, based on its determination that the evidence did not support an award of punitive damages. The plaintiffs appeal from the order disallowing the award of punitive damages. We affirm in part, reverse in part, and remand.
The issues are (1) whether the evidence supported the jury's finding that Roberts made a mistaken misrepresentation and whether Roberts was negligent in failing to discover and notify the plaintiffs that the Internal Revenue Service ("I.R.S.") held a statutory right of redemption on the house that the plaintiffs purchased through the real estate agency operated by Roberts; (2) whether the plaintiffs are entitled to recover compensatory damages for mental anguish; (3) whether the evidence supported the jury's finding that Realty and Lawyers made fraudulent reckless misrepresentations and also breached their duty to disclose a known title defect to the plaintiffs; and (4) whether the evidence supported an award of punitive damages against Realty and Lawyers.
The evidence at trial was as follows: In 1983, Richard and Shirley Magill purchased a house at 6009 Cumberland Road in Mobile, Alabama, and executed a second mortgage to the sellers, Archie E. Lewis and David K. Farr. The Magills came upon serious financial hardships, and among their problems was an I.R.S. federal tax lien in the amount of $77,684.44. The lien was recorded in the Mobile County recording office on March 9, 1984. As a result of their financial woes, the Magills listed their house for sale with the Roberts real estate agency. Ann Akridge of Roberts was the Magills' sales representative. She maintained a "property" file on the property and a "personal" file on the Magills. Those files indicated that she had actual knowledge of the I.R.S. tax lien. In fact, she had discussed the tax lien problem with William Revere at the I.R.S. office and had also discussed it with the Magills. Revere informed her about the process of discharging the lien so that the property could be sold free and clear of the lien. Revere told her that the lien attached to "any and everything" that the Magills owned.
The Magills defaulted on the mortgage held by Lewis and Farr, and foreclosure proceedings were instituted by Lewis and Farr's attorney, Robert P. Denniston. The I.R.S. was timely notified of the foreclosure action. Christine Robinson, a sales agent with another real estate agency, presented to Akridge an offer to purchase the Magill property. Robinson testified that she presented the offer a few days before the foreclosure and that Akridge did not tell her about the tax lien.
On July 2, 1984, Lewis and Farr purchased the Magill property at the foreclosure sale. By operation of law, the I.R.S. tax lien was extinguished by the foreclosure, and a one-year statutory right of redemption in favor of the I.R.S. was created. The Magills also had a one-year right of redemption. The I.R.S. right of redemption is the basis of this lawsuit.
Akridge testified that it was her understanding that any liens on the property were extinguished by the foreclosure and that she did not know that the foreclosure of the tax lien gave rise to the I.R.S.'s right of redemption.
After the foreclosure sale, Lewis and Farr listed the property for sale through the Roberts agency. Akridge testified that Lewis and Farr were her clients. Akridge was a Roberts broker/branch manager and supervised 40 sales agents.
Also in 1983, the Vellas hired Steve Sparks, a sales agent with the Roberts agency, who was under Akridge's supervision, *581 to help them sell their house and find a new one. Sparks showed them the house at 6009 Cumberland Road, formerly owned by the Magills. In January 1984, the Vellas were informed by Sparks and Akridge that the Magills had a right of redemption on the property and that the redemption period expired on July 2, 1985. It is undisputed that the Vellas knew about the Magills' right of redemption. The Vellas agreed to pay $147,000 for the house, and signed a contract on January 28, 1984, which contained this sentence: "Buyer is aware of the right of redemption." It is also undisputed that no one from Roberts told the Vellas about the I.R.S. right of redemption. The Vellas testified that Akridge told them that the Magills were in serious financial trouble and that the Magills would not be able to redeem the property before June 2, 1985. The Vellas expressed concern about the Magills' right of redemption, but they were assured by Sparks and Akridge that it was a "perfectly safe transaction."
In March 1985, the Roberts agency contacted Realty and requested a title examination on the Cumberland Road property. Rebecca Jones was the title examiner. Her worksheet from the title examination indicated that she had found the I.R.S. tax lien on record and had enclosed a copy of the tax lien in the file. Jones also found on record the auctioneer's deed to Lewis and Farr from the foreclosure sale. A copy of the deed contained a handwritten notation "OK as per ABW" (ABW are the initials of Realty's chief executive officer, Alan B. Weissinger) and the words "Internal Revenue Service" were underlined where they appeared on the front page of the deed. Thereafter, a title commitment was issued by Lawyers through Realty. The title commitment contained the following statement, known as "exception 11":
"11. Rights of redemption from foreclosure of mortgage by Richard J. Magill and Shirley E. Magill, husband and wife, to Archie E. Lewis and David K. Farr dated June 13, 1983, and recorded in Real Property Book 2483, page 644 as evidenced by foreclosure deed dated July 2, 1984 and recorded in Real Property Book 2635, page 829."
The Vellas were told by Sparks that the only "black mark" on the property that showed up on the title commitment was the Magills' right of redemption.
On April 5, 1985, the Vellas met at Realty's offices with Sara Roberts, Realty's escrow officer/closing agent, and Sparks to close the sales transaction. Neither Akridge nor Lewis and Farr attended the closing. Sara Roberts had in her possession the title examiner's file, which contained the copy of the I.R.S. tax lien. John Vella testified that Sara Roberts read the title commitment's exceptions to him, including "exception 11." He testified that she asked him, "Do you know what the right of redemptions [sic] are?" He replied that Sparks had told him that the Magills had the right to redeem but that because of their poor financial condition they would be unable to redeem. He testified that Sara Roberts then said to him, "I just wanted you to be aware of the right of redemption." The Vellas testified that Realty did not tell them about the I.R.S.'s right of redemption; that Sara Roberts did not show them the copy of the I.R.S. tax lien; and that the term "I.R.S." never came up. Sara Roberts testified that she had not read the exceptions to the Vellas and that she had asked the Vellas if they "were aware the rights of redemption were still outstanding." However, she admitted on cross-examination that she did not remember the Vellas' response to her inquiry; but nevertheless, it was her testimony that the Vellas "were aware the rights of redemption were outstanding."
The Vellas further testified that they relied on the representations made by Roberts, Realty, and Lawyers that indicated to them that only the Magills had the right to redeem and that if they had known about the I.R.S.'s right of redemption they "would not have touched it with a ten-foot pole." In other words, the Vellas said they would not have purchased the Cumberland Road property on April 5, 1985, if they had known of the I.R.S.'s right of redemption.
*582 Five weeks after the Vellas had moved into their house on Cumberland Road, they received a letter dated May 10, 1985, from William Revere of the I.R.S. The letter stated that the I.R.S. was considering redemption of their property pursuant to § 7425(d) of the Internal Revenue Code. The next day, John Vella called Sparks and told him about the I.R.S. letter. Sparks told him that he would try to find out what was going on. John Vella testified that Sparks told him that the I.R.S. was just "bluffing" and that that was the way the I.R.S. "harassed" private citizens. He also testified that he tried to contact the president of Realty, George Williams, on three or four occasions but that Williams failed to return any of his telephone calls. He also testified that he talked to Revere at the I.R.S. and that Revere told him he was not bluffing. In fact, the Vellas home was advertised in a Mobile daily newspaper. Revere told the Vellas that he had six bids on the house and that several people wanted to see the inside of their house. John Vella testified that the receipt of the I.R.S. letter caused them much distress; that "it was like a nightmare"; that he was "strung out"; that he "couldn't sleep"; that he "was in a position of the house being taken away" from him; and that he "didn't know what to do."
Ethel Carter, Roberts's executive vice president of residential sales, testified that she discussed the I.R.S.'s right of redemption with Williams and Weissinger of Realty after John Vella had informed Roberts about the problem. She testified that Williams informed her that Realty used "exception 11" as a "catchall" exception and that Realty had a policy of not itemizing all encumbrances. She also testified that Roberts relied absolutely on the title companies to research a title. Carter later wrote the Vellas a letter telling them to seek legal advice and to comply with the I.R.S. time requirement, and in June 1985 the Vellas paid $12,500 to the I.R.S. in satisfaction of the value of the I.R.S. right of redemption.
Williams, president and a principal owner of Realty, testified that his company has used the language in "exception 11" for 20 to 30 years. However, there was evidence that Lawyers had provided Realty with a "policy writing and exception manual" that warned against using such an exception provision in writing commitments. This manual was available for Realty's use at the time the Vellas' title commitment was written. The manual stated in part:
"The United States has the same period of redemption (120 days, or longer period prescribed by state law) in the case of nonjudicial sales divesting a junior federal tax lien as it has with respect to judicial sales having that result.
"... Any policy or commitment issued during the period of redemption after a judicial or nonjudicial sale should contain the following exception unless the redemption has been released:
"`Z-95 Right of the United States to redeem the insured premises from foreclosure sale conducted on _________, as provided by the Federal Tax Lien Act of 1966 (26 U.S.C. 7425).'
"The regulation Sec. 301.7425-4 requires recordation of the certificate of redemption `without delay', however, because of a possible delay in the recording of the certificate, the above exception should be used for at least 60 days following the apparent expiration of the redemptive period."
However, Realty instructed its title examiners not to use the manual's language. Williams testified that putting in the language recommended by the manual "would only clutter the commitment." In addition to the manual's recommendation, a Realty representative received some literature from Lawyers at a seminar that recommended that the following language be used in writing exceptions:
"All rights outstanding by reason of the statutory right-of-redemption from the foreclosure of that certain mortgage given by _________ to _________ recorded in volume __________, page _________, said foreclosure being evidenced by Foreclosure Deed to __________ dated _________, recorded *583 in volume __________, page _________." (Emphasis added.)
This provision is similar to "exception 11," except that the words "All rights" do not appear in "exception 11."
Williams also testified that Realty had knowledge of the I.R.S. right of redemption. He testified as follows:
"Q Did your company have actual knowledge that the I.R.S. had a right of redemption?
"A We had actual knowledge if you impute the knowledge of our examiner to the company. I had no knowledge of it. I had never seen the case, never heard of the Vellas or anything else, of course, until after Steve Sparks came in. But if you impute to the company the knowledge of the examiner who examined it, the examiner, of course, knew that these were one of the rights of redemption, that's the reason she found it. She had to find out that it had been proper notice given, and she had to know from her examination that this was no longer a lien against the property. So she knew it had been transferred to a right of redemption."
Williams also testified as follows:
"Q Is it your position that your closing agent is only authorized just to simply to read down through the exceptions?
"A Yes. That's all she could do so far as commenting on the legal rights of the party.
"Q Well, what is she supposed to do if, for instance, she knows thatyou know, there is some kind of an easement, power line easement, or the house has termites, or it's built on a clay pit, or there is some other problem with the file that she knows about with the house that she knows about, and she knows that those people sitting in front of her don't know about it, you mean to tell me her duty is just to be quiet?
"A Her duty is to furnish this title commitment to the real estate people, who are therepresenting them, and it's up to them to show their clients what we have found. As it's been told in here in the last two days a dozen times, the real estate people call on us to make a title examination. They do not call on us, though, to explain what we find to the buyers. That is not what we do. What we do is furnish a commitment which shows what's against the property, and it's up to the real estate agent and the purchaser to go over that commitment and see whether they want to buy that property and accept a policy which will contain the same exceptions which are set out in that commitment.
"Q Well, why, thenwhy, then, didn't didn't your closing agent tell the Roberts Brothers' agent about this tax lien or about the I.R.S. right of redemption so that the Roberts Brothers' agent could then advise the Vellas?
"....
"A Excuse me. All they need to know is was there any money to be made. That's what the real estate person does. They find out what it will cost to redeem this piece of property, and then they can advise their client whether it's all right to go ahead and take the risk of buying because it's going to cost so much to redeem it that it wouldn't be profitable to anybody to redeem it. But to point out that the I.R.S. had a right to redeem would be raising a false flag. That would give them the idea that this is the only thing. They might go down to the I.R.S. and get one of these releases of right to redeem, which is the item that the Magills went and got, and even after they got that and paid Twelve Thousand Five Hundred Dollars on it, and I believe that was on June the 19th, they still had another ten days that somebody else could have come in and redeemed it from them after they paid the I.R.S. off. So all they needed to know [was] that there were rights of redemption and whether it would be profitable for somebody to redeem."
Williams further testified that the copy of the tax lien in Realty's file at the closing *584 "was a piece of paper which was not germane to anyone's rights" at the time of closing and that "it had nothing to do with the title, so why show it to [the Vellas]?"
Williams maintained that the I.R.S.'s right of redemption was excepted by the language of "exception 11" in the title binder and the title policy. Furthermore, Williams testified that he did not know that John Vella had tried to call him three or four times and that he had not avoided talking to the Vellas.
In July 1985, the Vellas sued Roberts, Realty, Lawyers, Lewis, and Farr. The Vellas alleged, inter alia, willful, reckless, and mistaken misrepresentation against Roberts, Realty, and Lawyers; suppression of a material fact against Realty and Lawyers; and negligence against Roberts.
The trial court entered a directed verdict in favor of Lewis and Farr, and they are not involved in this appeal.
The case was submitted to the jury on the claims of (1) innocent or mistaken misrepresentation and reckless misrepresentation against Roberts, Realty, and Lawyers; (2) negligence against Roberts; and (3) a breach of the duty to disclose against Realty and Lawyers. The jury was charged that it could award only compensatory damages for monetary loss and mental anguish and that punitive damages were allowable if it found in favor of the plaintiffs on the claim of reckless misrepresentation.
The jury returned a special verdict in favor of the Vellas on (1) the claim of mistaken misrepresentation against Roberts; (2) the claim of negligence against Roberts; (3) the claim of reckless misrepresentation against Realty and Lawyers; and (4) the claim of breach of duty to disclose against Realty and Lawyers. The jury awarded the Vellas compensatory damages in the amount of $100,000 and punitive damages in the amount of $275,000.
The trial court granted the motions of Realty and Lawyers for judgment notwithstanding the verdict on the claim for punitive damages. In compliance with Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), the trial court found that the award of compensatory damages, although high, was not excessive as a matter of law and that the verdict was not based upon "bias, passion, corruption, or other improper motive." However, with respect to the punitive damages, the trial court stated that "there is no evidence in the record which would support a finding that the title companies intended to deceive plaintiffs or that the misrepresentation was made so recklessly as to amount to intent. Nor was the fraud malicious, oppressive or gross." The defendants and the plaintiffs appealed.

I.
Roberts argues, inter alia, that it made no misrepresentation to the Vellas, because, it contends, it did not know that the I.R.S. had a right of redemption on the property. It further argues that its prior knowledge of the I.R.S. tax lien against the Magills did not charge it with knowledge of the I.R.S.'s right of redemption. Citing Speigner v. Howard, 502 So.2d 367, 371-74 (Ala.1987), Roberts also argues that as a listing real estate agent, it did not owe a duty of care to the Vellas to discover and report title defects.
We agree that Roberts did not owe a duty to perform a title search on the Cumberland Road property. However, there was enough evidence to establish an agency relationship, so that Roberts owed a fiduciary duty to the Vellas to disclose any material facts of which it had actual knowledge. Davis v. Brown, 513 So.2d 1001 (Ala.1987), citing Cashion v. Ahmadi, 345 So.2d 268 (Ala.1977). The fact that there was an I.R.S. tax lien on property which was subsequently foreclosedgiving rise to the I.R.S.'s right of redemption was a material fact that Roberts had a duty to communicate to the Vellas. Akridge had actual knowledge that there was an I.R.S. tax lien on the property; her excuse for not telling the Vellas was that she did not know that the foreclosure of the tax lien created a right of redemption in the I.R.S. Roberts had actual and superior knowledge of facts that should have incited it to further inquiry regarding the status and consequences of the tax lien. *585 Akridge had learned it was a problem when she had previously called the I.R.S. office. Roberts made misstatements of fact through Sparks and Akridge. The Vellas were told that the Magills' right of redemption was the only "black mark" on the property. There was evidence from which the jury could have found that the Vellas' reliance on Roberts's misrepresentation was not unreasonable. Padgett v. Hughes, 535 So.2d 140 (Ala.1988). Furthermore, the Vellas were under no duty to examine the title to the property to ascertain the true state of the title. Dickinson v. Moore, 468 So.2d 136 (Ala.1985); Shahan v. Brown, 167 Ala. 534, 52 So. 737 (1910). We, therefore, conclude that the evidence supported the jury's findings that Roberts was negligent and had also made a mistaken misrepresentation upon which the Vellas reasonably relied to their detriment. We affirm that portion of the judgment.

II.
The defendants argue that the Vellas were not entitled to recover compensatory damages on the claim of mental anguish. We disagree. This Court has not required mental anguish to be corroborated by the presence of physical symptoms and has upheld the award of compensatory damages on the claim of mental anguish in similar cases that involved an impingement on the peace, well being, and solitude of the plaintiff's home. See Orkin Exterminating Co. v. Donavan, 519 So.2d 1330 (Ala.1988); B & M Homes, Inc. v. Hogan, 376 So.2d 667 (Ala.1979); F. Becker Asphaltum Roofing Co. v. Murphy, 224 Ala. 655, 141 So. 630 (1932). Pursuant to Hammond v. City of Gadsden, supra, the trial court determined that the award of compensatory damages was not excessive and that the verdict was not based on improper motive. We find no error in that portion of the judgment regarding the award of compensatory damages, and we affirm the judgment for compensatory damages.

III.
Realty and Lawyers argue, inter alia, that the Vellas could not have relied on the alleged misrepresentations because the contract obligated them to purchase the property. They also argue that there was "no duty to notify the Vellas that the I.R.S. had in fact an outstanding right of redemption," citing Holmes v. Alabama Title Co., 507 So.2d 922 (Ala.1987), and Williams v. Bank of Tallassee, 456 So.2d 50, 52 (Ala. 1984). They further argue that Sara Roberts did not make any misrepresentations of material fact to the Vellas at the closing, and that she was prohibited from giving "legal advice" to the Vellas concerning the statutory rights of redemption. Realty and Lawyers maintain that the language of "exception 11" effectively included the I.R. S.'s right of redemption.
We conclude that the defendants' first argument is without merit, because the sales contract allowed the Vellas the option to refuse to close if the title was not marketable.
At the outset, we note that in a fraud action, a duty to speak may exist in the absence of a contractual relationship or without dealings between the parties. "Whether a duty to speak arises depends upon the relationship of the parties, the value of the particular facts, the relative knowledge of the parties, and other circumstances.... The determination of the existence of duty in this context is a question for the jury...." Hopkins v. Lawyers Title Ins. Corp., 514 So.2d 786, 790 (Ala. 1986) (citations omitted). The purpose of title insurance is "to protect the insured against defects in the title." Holmes, supra, at 925. In this case, the relationship between Realty, Lawyers, and the Vellas is sufficient to impose a duty on Realty and Lawyers to disclose all title defects of which they had knowledge. The I.R.S.'s right of redemption is a title defect. Williams testified that Realty had actual knowledge of the I.R.S.'s right of redemption. However, Realty argues that the I.R.S.'s right of redemption was included in "exception 11." The determination of the meaning of "exception 11" was for the trier of fact, and the evidence supported a finding that the I.R.S.'s right of redemption was not within the exceptions included *586 in "exception 11" and that, in the title commitment to the Vellas, Realty and Lawyers had breached the duty to disclose the I.R.S.'s right of redemption.
Furthermore, the Vellas testified that Sara Roberts confirmed their interpretation of the meaning of "exception 11" that only the Magills had the right of redemptionand that she did not show them the copy of the tax lien that was in her file. This evidence supported the jury's findings that Realty and Lawyers misrepresented the facts to the Vellas and also breached their duty to disclose. We affirm that portion of the judgment.

IV.
Finally, Williams testified that he deliberately disregarded the recommended language in the manual provided to his company by Lawyers for writing exceptions. He testified that his title examiners were instructed not to use the language in the manual and that he thought the manual's recommended exception would "only clutter the commitment." The jury found that "exception 11" in the title commitment and policy did not inform the Vellas that the I.R.S. had an outstanding right of redemption. Moreover, Williams testified that Realty and Lawyers had actual knowledge of the I.R.S.'s right of redemption. This evidence, in light of the fact that Realty disregarded the warning and recommendation of the manual that the I.R.S.'s right of redemption be clearly excepted, supported the jury's finding that Realty and Lawyers recklessly misrepresented the facts to the Vellas.
Punitive damages may be awarded on proof of reckless misrepresentation. "`[I]t is the finding of intent to deceive, which must be based upon the initial finding of knowledge of the falsity of the material misrepresentation, that triggers the discretionary power of the factfinder to award punitive damages.'" Carnival Cruise Lines, Inc. v. Goodin, 535 So.2d 98, 103 (Ala.1988) (citation omitted). In the case of an intentional deception, punitive damages may be awarded without regard to "grossness, oppressiveness, or maliciousness." Id. An intent to deceive may be found from a reckless misrepresentation. Punitive damages may be awarded where there is a misrepresentation that is made so recklessly and heedlessly as to amount to the same thing as knowledge of its falsity. Id.; American Honda Motor Co. v. Boyd, 475 So.2d 835 (Ala.1985); Ex parte Lewis, 416 So.2d 410 (Ala.1982). Code 1975, § 6-5-103, provides:
"Willful misrepresentation of a material fact made to induce another to act, and upon which he does act to his injury, will give a right of action. Mere concealment of such a fact, unless done in such a manner as to deceive and mislead, will not support an action. In all cases of deceit, knowledge of a falsehood constitutes an essential element. A fraudulent or reckless representation of facts as true, which the party may not know to be false, if intended to deceive, is equivalent to a knowledge of the falsehood."
We conclude, therefore, that the evidence supported the jury's finding that Realty and Lawyers made a reckless misrepresentation and that they intended to deceive the Vellas. The jury was permitted to award punitive damages against Realty and Lawyers on the claim of reckless misrepresentation. Accordingly, we reverse the judgment of the trial court as to the holding that punitive damages were not recoverable, and we remand this cause to the trial court for further proceedings pursuant to Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), for a determination of whether the award of punitive damages was excessive.
Therefore, the judgment is affirmed in part and reversed in part, and the cause is remanded.
88-400 AFFIRMED.
88-401 AFFIRMED.
88-402 REVERSED AND REMANDED.
88-403 AFFIRMED.
HORNSBY, C.J., and JONES, ALMON, ADAMS and STEAGALL, JJ., concur.
*587 HOUSTON, J., concurs in part and dissents in part.
HOUSTON, Justice (concurring in part and dissenting in part).
When can punitive damages be awarded in fraud actions? The lawyers for Lawyers Title Insurance Company correctly note:
"Intent to deceive is the bedrock of a fraud case. Without it, the law allows only compensatory damages. With it, punitive damages may be awarded at the jury's discretion. State Farm Fire & Cas. Ins. Co. v. Lynn, 516 So.2d 1373, 1376 (Ala.1987). To prove an intent to deceive, the [plaintiffs] were bound to produce evidence that [defendant] made a misrepresentation ... knowing that it was false, or that [defendant's] conduct was so reckless that it amounted to the same thing as a knowing lie. [State Farm Fire & Cas. Ins. Co. v. Lynn, supra]; Crowder v. Memory Hill Gardens, Inc., 516 So.2d 602, 604-05 (Ala. 1987)."
There is perhaps too much charity in these fine lawyers' further observation:
"Over the years, this Court has struggled to apply these simple rules to an endless array of facts, and to formulate meaningful standards for the guidance of bench and bar. It is no surprise that the different results in seemingly similar cases can be reconciled only by a painstaking factual analysis. Compare Mobile Dodge, Inc. v. Waters, 404 So.2d 26 (Ala.1981) (disallowing punitive damages), with Ex parte Lewis, 416 So.2d 410 (Ala.1982) (upholding punitive damages).
"This case is no different. Its resolution ultimately turns on whether the events at closing can rationally be characterized a brazen dereliction of duty or an unfortunate misunderstanding borne of the limitations of the English language and the relationship of the parties."
(Emphasis supplied.)
I appreciate the problem that the bench and bar has with this Court's struggle to apply these simple rules of law to the various sets of facts presented to us. I would accept the challenge and attempt to articulate meaningful standardsthe absence of which has caused less charitable lawyers to refer to our opinions in this area as "burnt toast justice" (based on what the Justices had for breakfast) or, even worse, "sausage factory justice" (it does not matter what junk goes into the opinion as long as the end result is to the Justice's liking). However, my view of these facts does not allow me to reach this issue.
I find no duty to disclose on the part of Lawyers Title or Realty Title. Alfa Mutual Insurance Co. v. Northington, 561 So.2d 1041 (Ala.1990); Colonial Bank of Alabama v. Ridley & Schweigert, 551 So.2d 390 (Ala.1989) ("[d]uty is an essential element of fraud").
The agent for Lawyers Title and Realty Title asked the plaintiffs at the closing if they were aware of the rights of redemption. In response to this, plaintiff John H. Vella III "told her what [defendant] Roberts Brothers had told us about the fact that Richard and Shirley Magill [former owners of the property] had the right to redeem the property but that she [the agent of Lawyers Title and Realty Title] didn't have to worry about it because [the Vellas] had been assured that there was no way [the Magills] could or would want to redeem the property before July 2nd." In response to this, the agent for Lawyers Title said, "I just wanted to make sure you knew what rights of redemption meant."
"Title companies and title insurance companies are not required to explain the significance and effect of exculpatory covenants and the like discovered in their title searches."
Holmes v. Alabama Title Co., 507 So.2d 922, 925 (Ala.1987). They are forbidden from giving legal advice. Coffee County Abstract & Title Co. v. State ex rel. Norwood, 445 So.2d 852, 857 (Ala.1983). However, if the United States Internal Revenue Service had a right to redeem, then internal procedures required that the following exception be placed in the title commitment: "Z-95 Right of the United States to redeem the insured premises from foreclosure sale *588 conducted on [date], as provided by the Federal Tax Lien Act of 1966 (26 U.S.C. 7425)."
This was not done. As a consequence of this failure to comply with company procedure, the Vellas could possibly have recovered against Lawyers Title under the title insurance policy, for any loss that they sustained as a result of the I.R.S.'s redeeming the property insured, for this had not been "excepted" from coverage in accordance with company directives.
Likewise, Lawyers Title required that exclusions in title commitments and policies exclude "[a]ll rights outstanding by reason of the statutory right of redemption" instead of "[r]ights of redemption from foreclosure of mortgage," the phrase used in the Vellas' commitment and title policy. This may have afforded the Vellas a right of action under the policy for any loss that they sustained as a result of the I.R.S.'s redeeming the property insured under the title insurance policy.
But does this impose upon Lawyers Title or Realty Title a duty to disclose that will support a cause of action for fraud? I think not. Holmes v. Alabama Title Co., supra. Therefore, I would affirm the trial court's judgment.
I do not think that the trial court erred in submitting the negligence or misrepresentation claims against Roberts Brothers to the jury.
In fraud cases, the trier of fact should be apprised, as follows:
"Fraud is never presumed; and to be accepted as a basis for judicial action it `must be proved by clear and satisfactory evidence; and when a transaction is susceptible fairly to two constructions, the one which will support and free it from the imputation of impurity of intention will be adopted.'"
Henderson v. Gilliland, 187 Ala. 268, 272, 65 So. 793, 794-95 (1914) (quoting Allen v. Riddle, 141 Ala. 621, 37 So. 680 (1904)).
My review of the facts in this case persuades me that there was at least a "scintilla of evidence" (the applicable standard in this case) of each element of mistaken misrepresentation against Roberts Brothers for this issue to be submitted to a jury and that the jury's verdict was not plainly and palpably wrong.

ON APPLICATION FOR REHEARING
KENNEDY, Justice.
Lawyers and Realty, as well as several amici curiae title companies, complain that the decision in this case is contrary to prior law. They complain that our opinion places a duty on title companies to disclose as to all possible redemptioners, creates new fiduciary duties for title companies, and requires title companies to engage in the unauthorized practice of law.
We disagree. Present at the closing with the Vellas were Sparks and Sarah Roberts, Realty's closing agent for the transaction. Roberts had the title examiner's file in front of her; that file contained the IRS tax lien. Roberts opened the file, took out the commitment for title insurance, and read to the Vellas the list of exceptions. After reading exception 11, which is quoted in our original opinion, Roberts asked the Vellas, "Are you aware of the rights of redemption?" John Vella answered by telling her what Roberts Brothers had told him: that Richard and Shirley Magill had rights to redeem the property, but that the Vellas had nothing to worry about because the Magills could not and would not redeem the property. Although Roberts Brothers' description of the rights of redemption was only half-accurate, Sarah Roberts confirmed the Vellas' understanding that only the Magills had rights of redemption by answering, "I just wanted to make sure you knew what rights of redemption meant."
A consideration of these facts reveals the answer to the title companies' complaints. Realty and Lawyers had actual knowledge of the IRS tax lien. They had actual knowledge not only that the Vellas did not know of the IRS tax lien or right of redemption but also that the Vellas believed that the only rights of redemption on the home were the Magills' rights of redemption. The title companies nevertheless affirmatively represented to the Vellas that *589 the language of exception 11 meant that only the Magills had a right of redemption.
Those facts sufficiently support the Vellas' claim of reckless misrepresentation and the award of punitive damages. The opinion does not create a new duty to disclose regarding all possible redemptioners, nor does it create new fiduciary duties for title companies. As the opinion states, the title companies were bound by the duty described in Hopkins v. Lawyers Title Ins. Corp., 514 So.2d 786 (Ala.1986).
Contrary to the complaints of the title companies, the opinion does not require title companies to engage in the unauthorized practice of law. The tax lien was in the file. For the title companies to disclose the fact of the existence of the lien would have in no way required giving an opinion or legal advice, Holmes v. Alabama Title Co., 507 So.2d 922 (Ala. 1987).

OPINION EXTENDED; APPLICATION OVERRULED.
HORNSBY, C.J., and JONES, ALMON, ADAMS, HOUSTON and STEAGALL, JJ., concur.