[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 690 
Evelyn Crocker, individually and as the beneficiary and administratrix of the estate of Coleman S. Crocker, sued Union Security Life Insurance Company ("Union Security") and First Alabama Bank of Choctaw ("First Alabama"), alleging claims of fraud, concealment, breach of contract, bad faith, and a scheme to defraud, in relation to First Alabama's sale of credit life insurance policies and Union Security's failure to pay benefits under those policies. Mrs. Crocker subsequently amended her complaint to reflect that she was proceeding only in an individual capacity and not as the the beneficiary and administratrix of the estate of Coleman S. Crocker.
Mrs. Crocker alleged that Sammy Taylor, as an agent for both First Alabama and Union Security, induced her to buy a credit life insurance policy on the life of her husband although he knew that Mr. Crocker had a history of heart problems and was uninsurable. She further alleged that Taylor failed to ask the Crockers for medical information and that Taylor falsified the information he put on the credit life insurance application. Mrs. Crocker also alleged that, after her husband's death, Union Security breached its contract of insurance by failing to pay benefits and that this failure was part of a scheme of intentional fraud in relation to the selling of credit life policies.
The trial court dismissed the breach of contract and bad faith claims, and the fraud claims went to trial. The jury returned a verdict of $5 million for Mrs. Crocker, and the trial court entered a judgment upon this verdict. Both First Alabama and Union Security moved for a J.N.O.V., a new trial or, in the alternative, a remittitur, and moved to stay execution of the judgment until their post-judgment motions were ruled upon. After a hearing, the trial court denied the defendants' J.N.O.V. motion and further denied the defendants' motion for new trial, subject to Mrs. Crocker's acceptance of a $2 million remittitur. Mrs. Crocker accepted the remittitur, and Union Security alone appealed.
During the pendency of this appeal, Mrs. Crocker entered into a pro tanto release with First Alabama, accepting $1 million in exchange for releasing First Alabama from any further liability in the case. When Union Security discovered this agreement, it filed in this Court a motion for an "emergency remand," arguing that the verdict was excessive against it as the sole remaining defendant and demanding a hearing in the trial court on the matter. This Court initially denied the motion, but later, after reconsideration, granted it and remanded the case for the circuit court to review the judgment for excessiveness, in accord with Hammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 *Page 691 
(Ala. 1989). On remand, the circuit court entered an order reaffirming its original Hammond order, without conducting a second hearing. Union Security's appeal on the merits was then returned to the active docket of this Court.
 I.
Union Security, which is headquartered in Atlanta, Georgia, and which is part of a European holding company, sells credit life insurance through lending institutions nationwide, including First Alabama. Various First Alabama loan officers are contractually authorized in this state to take applications for credit life insurance from their customers and to issue certifications of insurance for approved applications, showing that the coverage is in effect.
Union Security requires that, for credit life policies issued in conjunction with First Alabama loans in excess of $10,000, the customer execute a "Statement of Debtor's Physical Condition" before credit life coverage is issued. This health disclosure statement authorizes Union Security to receive any information related to the health, medical history, diagnosis, treatment, employment, or financial condition of the applicant, as long as this information is for the purpose of evaluating or underwriting the application for credit life coverage.
The health disclosure statement has nine boxes to be checked "yes" or "no" in response to specific questions concerning the applicant's medical history. Union Security requires that all of these boxes be checked "no," indicating that the applicant has had no prior history of particular illnesses before it will issue credit life coverage for the applicant. Union Security does not examine the health records of those applicants who indicate on the health disclosure statement that they have no history of a particular illness or health condition. Union Security does, however, reserve the right to examine applicants' health records to determine "after the fact" whether coverage should have been issued. Union Security does not issue a written policy to those applicants who are accepted for coverage.
In October 1990, Union Security was selling credit life insurance in conjunction with loans made by First Alabama in Choctaw County, Alabama. Union Security authorized Sammy Taylor, a First Alabama branch manager in Choctaw County, as its agent to offer the coverage to loan applicants, and it paid him a commission of the premiums on the credit life policies that it issued pursuant to the applications he obtained.
The Crockers knew Taylor and contacted him at the bank to inquire about obtaining a consolidation loan. Taylor advised Mrs. Crocker to pick up an application from the bank and complete it; they picked up one and then they met with Taylor. During this meeting, Taylor completed a separate health disclosure statement for each of the Crockers. He had premarked each of the nine health questions on the statements by checking the "no" boxes, indicating that neither of the Crockers suffered from any past illnesses. Mr. Crocker, however, had been suffering from Parkinson's disease for some years and had also undergone serious heart surgery twice within the last 10 years. The Crockers signed the respective health disclosure statements that Taylor had prepared for them.
Mr. Crocker died from heart disease in August 1991. Mrs. Crocker submitted a death certificate to Union Security and attempted to collect the credit life policy benefits. Union Security investigated the claim and denied coverage, based on Mr. Crocker's history of heart disease.
 II.
The first issue presented is whether the trial court erred in denying Union Security's motions for a summary judgment and a directed verdict on Mrs. Crocker's two claims involving alleged misrepresentation and concealment by Taylor. Union Security points out that Mrs. Crocker was required to establish (1) that Taylor had a duty to disclose an existing material fact; (2) that Taylor suppressed that fact; (3) that Taylor had actual knowledge of the fact and of its materiality; (4) that Mrs. Crocker's lack of knowledge of the material fact induced her to act; and (5) that she suffered actual damage as a proximate *Page 692 
result. Hardy v. Blue Cross Blue Shield of Alabama,585 So.2d 29 (Ala. 1991).
The existence of a duty to disclose is a legal question and is to be discerned from the confidential relations of the parties or from the particular circumstances of the case. Ala. Code 1975, § 6-5-102; Interstate Truck Leasing, Inc. v.Bender, 608 So.2d 716 (Ala. 1992). Some factors the court may consider are the relationship of the parties, the value of the particular facts, and the relative knowledge of each party.Bender. Where the accused has superior knowledge of the fact and the other party is being induced to take action that that party might not have taken had he or she known the fact, the obligation to disclose is particularly compelling. Bender.
The evidence shows that at the time he prepared the Crockers' health disclosure statements, Taylor had been acting as the agent for Union Security in the sale of credit life policies for many years and was quite knowledgeable about the qualifications an applicant must have in order to obtain credit life coverage. Taylor testified that he knew that if he indicated on the application form that Mr. Crocker suffered from any health problems, the credit life policy would not be issued to him. Taylor stated that he knew the credit life policy included a one-year period wherein Union Security could investigate the Crockers' medical history after issuing the policy, even if it had not done so before issuing coverage. Taylor testified that he received a commission from each credit life policy that was issued, regardless of whether the company ultimately paid benefits to the insured or not.
Although Taylor denied knowing that Mr. Crocker had a history of heart disease, other witnesses testified that Taylor did know of Mr. Crocker's past heart surgeries and had inquired about his condition during his periods of convalescence. Although Taylor denied knowing that Mr. Crocker suffered from Parkinson's disease, the evidence shows that Mr. Crocker had experienced constant and noticeable tremors for years and had displayed this symptom of the disease on the day Taylor filled out the application for credit life insurance. There was also evidence that Taylor and his wife had vacationed with the Crockers and that they had visited them in their home during the years that Mr. Crocker suffered from heart disease and Parkinson's disease. In spite of this, Taylor nevertheless indicated on the health disclosure statement that the Crockers were in good health and had no history of illness; doing so enabled him to issue the insurance policy to them and collect the commission from the policy for himself.
There is no evidence that the Crockers had such knowledge and experience concerning credit life policies that would have put them at arm's length in their dealings with Taylor; on the contrary, the evidence shows that the Crockers relied on Taylor's expertise and superior knowledge and regarded him as their source of information concerning their loan transaction and the process of applying for credit life insurance. In view of this evidence, the jury could reasonably find that Taylor had a duty to disclose to the Crockers that the policy benefits might not be paid if Mr. Crocker in fact had had health problems and that his failure to do so induced them to obtain the credit life coverage, for which premiums were paid until coverage was denied at Mr. Crocker's death.
 III.
Union Security next argues that the trial court committed several errors during the trial that require a reversal of the judgment against it.
Union Security first argues that the trial court erred in allowing into evidence the fact that it is a foreign-owned entity. Union Security claims that this evidence was injected into the trial as evidence of wealth, and it points out that a jury cannot consider the financial position of the defendant in assessing punitive damages. The questioning at issue occurred as follows:
 "Q. Mr. Hall, I believe you said that a Ms. Calik is your underwriter in your department and works under you.
"A. Yes, she is.
 "Q. She is employed by American Securities Insurance, is she not? *Page 693 
 "A. She worked for an American Securities Group at Union.
 "Q. American Securities Group and Union Security Life, they are both owned by the same company, are they not?
 "A. Yes, the Group is not an insurance company. The insurance company is under that Group.
 "Q. The Group is owned by Ferris Enterprises out of Europe. Is that correct?
 "Mr. Robertson [counsel for Union Security]: Your honor, I'm going to object to the relevance of that question.
"The Court: What is the question, Mr. Morris?
 "Mr. Morris [counsel for Crocker]: The question was that American Securities and Union — I mean, the American Security group that Ms. Calik works for in [Mr. Hall's] Department, and the Union Security Life Insurance Group are owned by Ferris Enterprises, which is a European company that owns both of them, but both people work in there.
 "The Court: What's the purpose of this line of questioning?
 "Mr. Morris: We are going to call Ms. Calik. She says in her deposition she worked for a separate company. I think we need to show that they are one and the same, basically.
 "Mr. Robertson: Judge, we don't see where that is at all relevant to what we're here on. "The Court: You don't need to get too far down the line. Go ahead.
"Mr. Morris: I won't. Go ahead.
"Q. [By Mr. Morris]: Isn't that true?
 "A. That's not the name of the company, sir. It's Fortis, F-O-R-T-I-S.
 "Q. Fortis. I'm sorry. Fortis Enterprises. All right. Now, either American Securities and/or the American Securities and Union Security do business with a number of banks. You don't do business with just First Alabama Bank?
"A. That's correct."
In this testimony, there was no mention of wealth in the questions, nor can we find any intimation of the surplus or net income of the corporations. We note that counsel for Mrs. Crocker mentioned in closing argument that Union Security's parent company was European; however, these remarks did nothing to establish any evidence of the corporation's wealth, and Union Security did not object to them. The trial court has broad discretion in ruling on matters in argument of counsel,United Companies Fin. Corp. v. Brown, 584 So.2d 470 (Ala. 1991), and, after reviewing the record surrounding this exchange, we cannot hold that the trial court erred in allowing the foregoing questions.
Union Security next argues that the trial court erred in allowing Mrs. Crocker to submit evidence of the amount of premiums First Alabama receives, on a statewide basis, from marketing credit life policies with its loans.
Mrs. Crocker submitted evidence that, for the years 1988, 1989, 1990, and 1991, First Alabama generated almost $40 million in gross premiums through the sale of credit life insurance. Mrs. Crocker also established that the loss ratios of Union Security with First Alabama through these four years were, respectively, 20.6%, 21.1%, 16.3% and 17.0%. She also presented expert testimony indicating that a 50% loss ratio was a more reasonable balance between the insurer and the insureds.
Mrs. Crocker points out that fraud loss ratios are admissible in evidence, Independent Life Accident Insurance Co. v.Harrington, 658 So.2d 892 (Ala. 1994), and argues that she could not compute the loss ratios for the jury without showing the gross earned premiums. Moreover, Union Security did not request a jury charge to limit consideration of the $40 million figure. After reviewing the record concerning the loss ratios, and the evidence as a whole, we find no error in the admission of evidence concerning First Alabama's gross earned premiums.
Union Security next argues that the trial court erred in refusing to charge the jury that punitive damages are not recoverable for innocent or mistaken fraud. Union Security requested the following charge: "The Plaintiff is not entitled to punitive *Page 694 
damages if you find that Sammy Taylor committed a fraud upon the plaintiff that was committed mistakenly, innocently or negligently." The trial court rejected this proposed charge and ultimately instructed the jury:
 "Now, ladies and gentlemen of the jury, if you are reasonably satisfied that the defendants have been shown by clear and convincing evidence to be guilty of an intentional misrepresentation, deceit or concealment of a material fact, which the defendants had a duty to disclose, which was gross, oppressive or malicious, and committed with the intention on the part of the defendants of thereby depriving the plaintiff of property or legal rights or otherwise causing injury, and the plaintiff did suffer injury or damage as a proximate result of such fraud, then in your discretion you may award the plaintiff punitive damages in addition to any actual damages you find from the evidence the plaintiff did suffer."
With this, the trial court correctly set out the very clear, specific limits on the type of intentional fraud that must underlie an award of punitive damages; nothing in this instruction would lead a jury to believe that an innocent or mistaken fraud could support a punitive damages award, so there was no reason to think an additional instruction would be needed. The trial court's refusal of a requested written instruction, even though it is a correct statement of law, is not a cause for reversal on appeal if it appears that the same rule of law was substantially and fairly given to the jury in the court's oral charge. See Rule 51, Ala.R.Civ.P. We therefore find no merit in Union Security's argument on this point.
 IV.
Union Security argues that the jury's verdict resulted from obvious bias, passion, and prejudice, and that it is due another hearing on the verdict. The trial court is peculiarly qualified to pass judgment on whether the verdict is the result of bias or prejudice. Davison v. Mobile Infirmary,518 So.2d 675 (Ala. 1986). Following the hearing on the question of excessiveness of the verdict, the trial court stated in its order that it considered "the presentation of the case by the respective attorneys; the demeanor, candor, and apparent truthfulness of the witnesses; the attentiveness by members of the jury and the 'feel' for fairness vel non in the atmosphere wherein the trial is conducted." Although the trial court went on to find that the verdict was excessive, it did so based solely on its determination that the award exceeded an amount necessary to accomplish society's goal of punishment and deterrence, based on the facts of this case. Our review of the record reveals nothing that contradicts the trial court's own observations made during the trial; thus, we find no error in its determination.
Union Security next argues that the trial court failed to properly review the jury verdict for excessiveness in accordance with the established standards set out inHammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986), andGreen Oil Co. v. Hornsby, 539 So.2d 218 (Ala. 1989).
In ruling on a motion for remittitur in a punitive damages case, the trial court must make essentially two separate but related determinations: whether the amount of the jury's verdict was set by a properly functioning jury and, if so, whether the verdict was nevertheless excessive as a matter of law because it exceeds an amount that will accomplish society's goals of punishment and deterrence. Hammond. We have already upheld the trial court's determination that the verdict was not tainted or influenced by bias, passion, prejudice, corruption, or other improper motive or cause. The question now is whether the jury verdict was excessive as a matter of law.
In ruling on this issue, the trial court could consider several factors, including (1) whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct, as well as the harm that actually has occurred; (2) the degree of responsibility of the defendant's conduct, the duration of the conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct; (3) the profitability of the defendant's conduct; *Page 695 
(4) the financial position of the defendant; (5) the costs of litigation; (6) the imposition of criminal sanctions on the defendant for its conduct, these to be taken in mitigation; and (7) the existence of other civil awards against the defendant for the same conduct, these also to be taken in mitigation.Green Oil.
The trial court's order following the Hammond hearing shows that the court extensively reviewed its copious trial notes, as well as the evidence and relevant case law on comparative punitive damages awards. The trial court's order reflects a thorough analysis of the jury verdict and, after an exhaustive review of the record, we agree that the punitive damages award, after remittitur, does not exceed the amount necessary to promote society's goals of punishment and deterrence, in order to exorcise fraud and inequity from the marketing of credit life policies. This Court recently observed the nature of this inequity in Huff v. United Ins. Co. of America, [Ms. 1931516, May 26, 1995] ___ So.2d ___, ___ (Ala. 1995), wherein we stated:
 "As the law in Alabama currently stands, an insurance company may issue a life insurance policy with its knowledge of its applicant's health coming solely from its agent's questioning of the applicant about his or her health history. The benefits from this type of transaction lie solely in favor of the insurance company and its agent. The insurance company receives premiums month after month, while the agent retains a commission from the sale. But when the insured dies, the insurance company refuses to pay the benefits provided by the policy. Its refusal is based upon its discovery, for the first time, that the insured's health was poor. When the policy is sold, an agent is not required to delve thoroughly into the applicant's background for the details of his health history. Such a requirement could prevent situations like the one in this case."
Union Security argues that it is entitled to a secondHammond hearing for a reassessment of the Green Oil factors in light of the fact that First Alabama had settled its liability. We note, however, that in its first Hammond order, the trial court specifically found that Union Security and First Alabama were jointly and severally liable for the judgment and that there was no evidence that "an award of $5,000,000 would place either defendant in receivership or bankruptcy." The judgment is now, of course, reduced to $2 million dollars and, in its second Hammond order, the trial court confirmed that it had already thoroughly reviewed the Green Oil factors and considered a second hearing unnecessary. After reviewing all of the record, we agree that the trial court's findings following the first Hammond order took into consideration the Green Oil
factors as they applied to Union Security jointly with First Alabama and as they applied to Union Security separately. We therefore find no error in the trial court's refusal to conduct a second hearing before issuing its second Hammond order after First Alabama had settled its liability to Mrs. Crocker.
Based on the foregoing, we affirm the trial court's judgment against Union Security.
AFFIRMED.
ALMON, SHORES, KENNEDY, and COOK, JJ., concur.
HORNSBY, C.J., and HOUSTON and INGRAM, JJ., recused.