706 So.2d 1108 (1997)
LIFE INSURANCE COMPANY OF GEORGIA
v.
James PARKER and Rosie Parker.
1951583.
Supreme Court of Alabama.
November 7, 1997.
*1109 Charles E. Vercelli, Jr., and David P. Stevens of Nix, Holtsford & Vercelli, P.C., Montgomery, for appellant.
Milton C. Davis, Tuskegee, for appellees.
BUTTS, Justice.
James Parker and his wife Rosie Parker sued Life Insurance Company of Georgia and James Mark Taunton in his capacity as an agent of the insurance company, alleging conversion, intentional misrepresentation, and fraudulent suppression of material facts in relation to the defendants' sale of life insurance policies to the Parkers. The trial court entered a summary judgment for Life of Georgia as to the conversion claim, but denied its summary judgment motion as to the fraud claims. At trial, the defendants moved for a directed verdict at the close of the plaintiffs' evidence and at the close of all evidence; the trial court denied those motions. The jury returned a verdict in favor of the Parkers, awarding them $4,276 in compensatory damages and $200,000 in punitive damages. Life of Georgia moved for a JNOV, challenging the sufficiency of the evidence and the amount of the punitive damages award; the trial court denied that motion and entered a judgment on the verdict on February 7, 1996. Life of Georgia appeals from the denial of its motions for a directed verdict and a JNOV.[1]

*1110 I.
"The standard of appellate review applicable to a motion for directed verdict is identical to the standard used by the trial court in granting or denying the motion initially. Thus, when reviewing the trial court's ruling on the motion, we determine whether there was sufficient evidence to produce a conflict warranting jury consideration." Ogle v. Long, 551 So.2d 914, 915 (Ala.1989). The standard of review for testing the sufficiency of the evidence when the sufficiency is challenged by either a motion for directed verdict or a motion for JNOV is the "substantial evidence rule." Id. Substantial evidence is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). In considering the question of the sufficiency of the evidence, we are required, as was the trial court, to view the evidence in the light most favorable to the nonmovant. Bussey v. John Deere Co., 531 So.2d 860, 863 (Ala.1988).
Viewed in the light most favorable to the Parkers, the evidence suggests the following: In 1993, James Mark Taunton, after working as an agent for another insurer for over 20 years, began employment as an agent for Life of Georgia. He was assigned a debit route that he worked regularly, collecting premium payments from policyholders and soliciting new business. Taunton soon met the Parkers, who were Life of Georgia policyholders on his debit route. He learned that James and Rosie Parker were 68 years old and 70 years old, respectively, and that both of them were in poor health. He also learned that Rosie Parker was legally blind because of diabetes and that the Parkers' only income was a monthly Social Security check.
In December 1993, Taunton visited the Parkers to conduct a "policy review" and to determine if they could buy more insurance from Life of Georgia. He saw that they had purchased three life insurance policies from Life of Georgia in 1981.[2] He noted that James Parker had a $1,000 policy and a $500 policy and that Rosie Parker had a $1,000 policy; all of these policies would pay the full face amount of benefits upon the Parkers' deaths.[3] Taunton was aware that the three policies would pay full benefits and that the Parkers could no longer qualify for whole-life policies, because of their age and health. Instead they could qualify only for a "graded-death-benefit" policy; with such a policy they would have to pay premiums for a minimum of three years before the policy would be worth its full face value upon their death.
Taunton pointed out to them that Rosie Parker had less insurance on her life than did her husband James, and he encouraged the Parkers to buy more insurance to "even out" their coverage. Taunton told them that he could "fix it" so that the Parkers could each have $2,000 in life insurance coverage. Taunton could not "even up" the Parkers' insurance by merely selling them another $500 policy, because Life of Georgia had stopped selling policies that small. Taunton therefore suggested that James Parker cash in his $500 policy and indicated that, if he did, the Parkers could receive "400 and something dollars" before Christmas, only a few weeks away. Taunton told them that they could purchase two new $1,000 policies, which he said he would add on to the two $1,000 policies they already had, combining the monthly premiums and giving them each $2,000 in coverage.
Taunton did not disclose to the Parkers that because of their age and health he could not sell them full-benefit policies. He did not inform them that the policies he would obtain for them would be graded-death-benefit policies that would not pay full benefits until after three years. Taunton told the Parkers that, with the new policies added to their 1981 policies, they would each have $2,000 in coverage; however, Taunton knew that the Parkers would not have this amount of coverage *1111 until the new policies had matured for three years.
The Parkers agreed that they wanted to have $2,000 apiece in death benefits and, believing that they were buying whole-life policies, signed the applications for the new policies. At the top of the applications were these words: "Application for Graded Death Benefit Life Insurance"; at the signature line were the words "I understand fully that this policy has a limited death benefit for the first three years." The applications did not define the terms "graded death benefit" or "limited death benefit" or explain how the benefits would be limited for the first three years.
Although the Parkers agreed to cash in James Parker's $500 policy, Taunton did not at that time execute the necessary paperwork to cash in the $500 policy, and the Parkers did not receive a check for the cash value of the $500 policy before Christmas. Life of Georgia did, however, issue two $1,000 graded-death-benefit policies to the Parkers, and Taunton went to their house in January 1994 to begin collecting the premiums for the new policies. James Parker explained to Taunton that he could not afford to pay the premiums, and Taunton told him that when the Parkers received their check for the cash value of the $500 policy, they could use it to pay the premiums on their insurance.
Toward the end of January 1994, the Parkers passed Taunton on the street as they were driving and he signaled for them to stop. He went to their car and gave James Parker a document to sign to cash in the $500 policy. Soon thereafter, the Parkers received a check for $141.17, representing the cash value of the policy. Mrs. Parker, still expecting to receive the "400 and something dollars" that she believed was due on the policy, delayed cashing the check, waiting until Taunton's next monthly stop at her house, when she planned to inquire why the amount was so small.
Life of Georgia normally directs its agents to continue making monthly calls on insureds who miss premium payments and to give them several months to make the payments current so that the policies may remain in force. However, Taunton did not return to the Parkers' house again after they failed to pay the January 1994 premium on the policies, and Mrs. Parker ultimately cashed the check.
After the Parkers did not make the January 1994 premium payment, the new graded-death-benefit policies lapsed. Because the premiums for the two $1,000 policies the Parkers had bought in 1981 had been added with the premiums for the two new policies, the Parkers' nonpayment of the premiums also caused the 1981 policies to lapse. However, there were certain provisions within the 1981 policies that thereafter went into effect. James Parker's policy was converted to "extended term insurance"; this meant that Life of Georgia used the net cash value of the 1981 policy to purchase term insurance that would pay the full face value of $1,000 at the event of his death, but shortened the period of coverage. James Parker was left with $1,000 in benefits payable upon his death, but only until December 8, 1999. Rosie Parker's 1981 life insurance policy converted to "reduced paid-up" status; that is, the cash value of her policy was lessened, but the policy would remain in effect for the same period as the original policy. Rosie Parker was left with a full coverage period, but only $608 in benefits for her beneficiaries upon her death.
The Parkers argued at trial that they had agreed to cash in the $500 policy only because Taunton represented that they would receive "400 and something dollars," i.e., most of the policy's face amount, at a time when they had a pressing need for the money. They further argued that Taunton suppressed the fact that the new $1,000 policies he wanted them to buy were graded-death-benefit policies, not whole-life policies. The Parkers argued that they would not have bought the new policies if they had known that they were graded-death-benefit policies. The Parkers also pointed out that, because of the changes in their coverage that they made based upon Taunton's representations, they lost part of the benefit of their 1981 policies, which, after the new policies lapsed, were converted into policies with lesser coverage. They claimed damages based upon the lesser amount of cash value that they received for *1112 the $500 policy, as well as $4,000 for the loss of the amount of coverage that they had believed the change in their policies would immediately bring them. They further sought damages for the stress, anxiety, and mental anguish they testified to having suffered as a result of their dispute with Life of Georgia.

II.
Life of Georgia first argues that the evidence was insufficient to support the Parkers' fraudulent suppression claim and that the trial court thus erred in denying its directed verdict and JNOV motions on this claim. To establish their claim of fraudulent suppression, the Parkers were required to show: (1) that Life of Georgia had a duty to disclose an existing material fact; (2) that Life of Georgia had actual knowledge of the fact and its materiality; (3) that Life of Georgia suppressed that fact; (4) that the Parkers' lack of knowledge concerning that fact induced them to act; and (5) that they suffered actual damage as a proximate result of their action. Hardy v. Blue Cross & Blue Shield, 585 So.2d 29 (Ala.1991). Under Ala. Code 1975, § 6-5-102, the particular circumstances that impose upon a party a duty to communicate a material fact may arise from the relationship between the parties, the relative knowledge of the parties, and the value of the particular fact and other circumstances. See Mason v. Chrysler Corp., 653 So.2d 951 (Ala.1995). Where one person has superior knowledge of a fact and suppression of that fact will induce another person to take action that he or she otherwise would not take, the obligation to disclose is particularly compelling. Dominick v. Dixie Nat'l Life Ins. Co., 809 F.2d 1559 (11th Cir.1987).
We hold, under the undisputed facts of this case, that Taunton, and, through him, Life of Georgia, had a duty to disclose to the Parkers the kind of policy they were purchasing, particularly in view of the Parkers' lack of education, their advanced age, and their poor health. The limitations of the new policies the Parkers were buying and the effect the change in insurance could have on their existing policies were material facts known to Life of Georgia, but which the Parkers had little means of knowing. The evidence also establishes that Life of Georgia had a duty to disclose the fact that, because of the Parkers' age and poor health, the new policies were of less value to them than their 1981 policies. A jury could thus conclude that as a result of Taunton's failure to disclose these facts the Parkers were induced to change their insurance, when they might not otherwise have done so.
Viewed in the light most favorable to the Parkers, the evidence shows that Taunton did not tell the Parkers that the new policies would not pay the full face value in benefits unless their deaths occurred after the policies had been in effect three years. Taunton did not explain that allowing the new policies to lapse would result in a modification of the two $1,000 policies the Parkers had maintained since 1981. Instead, Taunton merely impressed upon the Parkers their need to "even up" their coverage by purchasing more insurance, which they could not afford, and to compromise the modest, but stable, insurance policies they had maintained since 1981.
Life of Georgia argues that even if Taunton did not orally disclose to the Parkers that the new $1,000 policies were graded-death-benefit policies, they should have understood from reading the application what kind of policy they were buying, instead of relying upon Taunton to explain it to them. Life of Georgia emphasizes that the words "graded death benefit life insurance policy" were in the heading of the application and that a sentence near the signature line indicated the new policy would provide "limited death benefits" for the first three years. We do not agree that merely placing these terms on the application was the functional equivalent of explaining them to Rosie Parker, who is blind and could not read the application, or to James Parker, who has only a sixth-grade education and is a not sophisticated insurance buyer. As stated, Taunton's superior knowledge of the terms and his years of experience in selling such policies placed upon him the duty to inform the Parkers, at the very least, what kind of insurance they were buying, and he failed to do so. We therefore conclude that the trial court properly denied Life of Georgia's directed verdict *1113 and JNOV motions as to the Parkers' fraudulent suppression claim.

III.
Life of Georgia next argues that the evidence is not sufficient to support the Parkers' misrepresentation claim. To establish their claim of misrepresentation, the Parkers were required to show (1) that Taunton misrepresented a material fact; (2) that he did so willfully to deceive, recklessly without knowledge, or mistakenly; (3) that they relied on the misrepresentation and that under the circumstances their reliance was justifiable; [4] and (4) that they were caused damage as a proximate consequence of their reliance. Harrington v. Johnson-Rast & Hays Co., 577 So.2d 437 (Ala.1991). The Parkers argued that Life of Georgia misrepresented two material facts: (1) that they would not be entitled to the full face amount of death benefits under the two new $1,000 policies until the fourth year of the policy period, and (2) the amount of money they would receive when they cashed in the $500 policy.
Life of Georgia argues that even if Taunton, as the insurance company's agent, did misrepresent the limitations on the two $1,000 graded-death-benefit policies, he did not do so intentionally. However, Taunton assured the Parkers that by buying two new $1,000 policies and adding them to their existing $1,000 policies, they would have $2,000 each in life insurance coverage. He knew when he made this representation that the Parkers would not have the benefit of $2,000 each in life insurance coverage when they bought the new policies, but would have to pay for them for three years before the policies would pay the full amount of benefits in the event of their deaths. He also knew that the Parkers were elderly and in poor health, two conditions that made them anxious about their immediate future and weighed against the likelihood that they would desire to buy insurance that would not pay full benefits until years later.
Life of Georgia points out that Taunton earned only a very small commission on his business with the Parkers and could have earned much more by persuading them to cash in all of their existing policies and "evening out" their insurance by purchasing two $2,000 graded-death-benefit policies.[5] Essentially, Life of Georgia argues that Taunton did not mislead the Parkers into buying the graded-death-benefit policies, because, it claims, they did not buy enough of it to generate a greater gain for him. However, there is evidence that, but for Taunton's misleading statements, the Parkers would not have bought graded-death-benefit policies in any amount or even considered "evening out" their insurance coverage. Taunton represented to the Parkers that he could obtain for them two policies that, when added to their two existing $1,000 policies, would give them a death benefit of $2,000 each. Taunton knew, based upon their health and age, that the only kind of policy he could sell to the Parkers was a graded-death-benefit policy. Taunton knew when he sold them the new policies that this kind of policy would not immediately give the Parkers the full benefit he represented that the policies would have. Rosie Parker testified that the Parkers would not have bought the policies had they known that they would have to wait three years before the policies would provide the full face value in death benefits. The fact that Taunton did not sell the Parkers a greater amount of graded-death-benefit insurance, for a greater profit, does not change the evidence indicating that the Parkers bought the $1,000 policies in reliance upon Taunton's misrepresentations and might not otherwise have bought those policies. Based on these facts, the jury could have concluded that Taunton's misrepresentation as to the *1114 limitation of the graded-death-benefit policies was intentional.
Life of Georgia next argues that the evidence does not support a finding that Taunton misrepresented the amount of cash value that the Parkers would receive for the $500 policy. Life of Georgia correctly points out that, in the end, it did pay the Parkers $141.17, the amount they were actually due under the policy, and that it did so well within the six-month period allowed by the insurance policy. However, we do not agree with Life of Georgia that the ends justify the means in this case; although the Parkers ultimately received the amount they were due, there is evidence that they would not have cashed in the $500 policy at all if Taunton had not misrepresented both the amount they would receive and the time within which they would receive it. It is clear that the Parkers relied upon Taunton to inform them about the effect of their cashing in the policy, and their reliance was particularly justified in view of their age, health, and lack of education. As to the claim of fraudulent misrepresentation, the trial court properly denied Life of Georgia's motion for a directed verdict and its motion for a JNOV.

IV.
Life of Georgia next argues that the punitive damages award is excessive and amounts to a violation of its due process rights guaranteed by the Fourteenth Amendment. In its motion for a JNOV, Life of Georgia asked the trial court, among other things, to require a remittitur of punitive damages, based upon the claim of excessiveness; the court denied the motion, but the record does not contain written findings of fact to support the trial court's conclusion that the award was not excessive. See Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986). This Court stated in Hammond:
"The cases have consistently held that in deciding whether a jury verdict is excessive because it is the result of passion, bias, corruption, or other improper motive, a trial judge may not substitute his judgment for that of the jury. We have also recognized that the trial judge is better positioned to decide whether the verdict is so flawed. He has the advantage of observing all of the parties to the trial plaintiff and defendant and their respective attorneys, as well as the jury and its reaction to all of the others. There are many facets of a trial that can never be captured in a record, so that the appellate courts are at a special disadvantage when they are called upon to review trial court action in this sensitive area, although increasingly they are required to do so. Therefore, it is not only appropriate, but indeed our duty, to require the trial courts to reflect in the record the reasons for interfering with a jury verdict, or refusing to do so, on grounds of excessiveness of the damages."
493 So.2d at 1378-79 (citations omitted) (emphasis added). Because the trial court did not put in the record its reasons for refusing to interfere with the jury's verdict on grounds of excessiveness, we are unable to review its ruling on that issue. We therefore must remand this cause to allow the trial court to make written findings of fact on this issue, in compliance with Hammond.
We affirm the trial court's denial of Life of Georgia's directed verdict motion and its JNOV motion as they relate to the sufficiency of the evidence to support the Parkers' fraud claims. However, we remand the case for the trial court to make written findings on the issue of excessiveness of the punitive damages award. The trial court is directed to file a return with this Court within 28 days of the date of this opinion.
AFFIRMED IN PART AND REMANDED.
SHORES, HOUSTON, KENNEDY, and COOK, JJ., concur.
HOOPER, C.J., and MADDOX and SEE, JJ., concur in part and dissent in part.
HOOPER, Chief Justice (concurring in part and dissenting in part).

I. Introduction
There are two foundational aspects for analyzing a case in a court of lawthe facts and the law. Appellate review of a case requires that judges take into account all the *1115 relevant facts and apply the appropriate legal standard of review. I believe the majority's review of this case is lacking with respect to both of those aspects.

II. Case History
This case was tried to a jury on February 6-7, 1996. Three witnesses testified: the defendant Mark Taunton, the plaintiff Rosie Parker, and James Layson (a corporate representative for the defendant Life of Georgia). The defendants raise three issues on appeal: (1) Whether the defendants were entitled to a summary judgment against the Parkers' claims of intentional misrepresentation and suppression; (2) whether the evidence submitted at trial supports the jury's verdict and the subsequent punitive damages award; and (3) whether the jury's award of punitive damages is unconstitutionally high when considered in comparison with the compensatory damages awarded. I concur in affirming the award of compensatory damages, but I dissent from the majority's conclusion that the evidence supports a punitive damages award. Although I think no punitive damages award would be appropriate, I concur in remanding the case for a Hammond hearing.

III. The Facts
In order to fully explain why I think the majority opinion ignores certain aspects of this case, I need to tell the full story.
The Parkers complained that in December 1993, the defendant Mark Taunton came to their house on behalf of Life of Georgia and told them (1) that he would adjust their life insurance policies so as to leave each of them with $2,000 worth of life insurance coverage (a total of $4,000 for the couple), and (2) that before Christmas, they would receive a check for "400 and something dollars" for cashing in all the life insurance policies they had previously purchased from Life of Georgia.
To understand the basis of the Parkers' complaint and their understanding of life insurance, one must have some background information about the Parkers and the history of their life insurance since 1981. At the time of their December 1993 meeting with Taunton, Mrs. Rosie Parker was 70 years old; she had been educated to the sixth grade, and she had been legally blind for several years as a result of a diabetes condition. Mr. James Parker was 68 years old and had been educated to the fifth grade. In 1981, Mr. Parker purchased two life insurance policies, a $500 policy and a $1,000 policy. Mrs. Parker also bought a $1,000 policy in 1981. They each purchased one additional $1,000 policy in 1987. In April 1993, they cashed in the two 1987 policies and received a total of $399.
In December 1993, Life of Georgia issued two new $1,000 policies to the Parkers, based upon applications turned in by Taunton and signed by the Parkers. These documents also show that Mr. Parker surrendered his $500 policy for cash. Thus, after the Parkers' December 1993 purchase of insurance policies, each of them had two $1,000 policies, (a total of $2,000 in insurance coverage for each of them). Taunton testified that he understood this result to be what the Parkers had wanted at that time. Because the increase in Mr. Parker's coverage was below Life of Georgia's threshold for awarding a commission, Taunton received no commission for increasing Mr. Parker's $1,500 coverage to $2,000. However, he received a commission for increasing Mrs. Parker's insurance coverage from $1,000 to $2,000.[6] (R.T. 117, 195-97.)
*1116 The Parkers claim that at the December 1993 meeting, Taunton told them that they would each be issued $2,000 worth of new insurance and that they would receive "400 and something dollars" before Christmas of 1993 in cash value on previously purchased insurance that they wished to cash in. Mrs. Parker testified that she expected to cash in all the insurance she and Mr. Parker owned at that time and that she expected they would receive two new $2,000 policies each.[7] It is undisputed that the Parkers' goal was for the two of them to have equal amounts of insurance, as opposed to what they had had before meeting with Taunton$1,500 on Mr. Parker's life and $1,000 on Mrs. Parker's life. Taunton testified that Mr. Parker said that he thought he and his wife already had equal amounts of insurance$2,000 on the life of Mr. Parker and $2,000 on the life of Mrs. Parker. (R.T. 71, 72, 132, 138.) Taunton testified that he informed the Parkers that if they cashed in Mr. Parker's $500 policy, then they would receive a payout of between $139 and $152.[8] Mrs. Parker disputes that testimony. Taunton also testified that he believed he could accomplish what was necessary for the Parkers without cashing in their 1981 policies. He could meet their goal by cashing in the $500 policy and adding two new $1,000 policies to the two $1,000 policies they already owned. (R.T. 72.) Although the new $1000 insurance policies became effective as of December 13, 1993,[9] the Parkers received no check before Christmas from Life of Georgia. Taunton testified at trial that he knew the Parkers were elderly and in bad health. Taunton testified that if he had cashed in all of the Parkers' policies, as Mrs. Parker contends he promised to do, then the premiums for the replacement policies would have been too expensive for them because of their ages.[10]
No evidence in the record indicates that at the December meeting the Parkers signed any paperwork regarding the cash surrender of Mr. Parker's $500 policy. Mrs. Parker testified that neither she nor her husband signed any paperwork at that meeting. Mrs. Parker testified that Mr. Parker signed a form one day in January 1994 when, she said, Taunton signaled for them to stop while they were driving down the road. Mrs. Parker testified that she did not know the nature or purpose of the form that her husband signed regarding the cash surrender of his $500 policy, but, based on all the documents and the testimony, one must conclude that it was the form styled "Application for Cash Surrender" that relates to Mr. Parker's $500 policy.[11] However, Mrs. Parker testified that she knew a person had to sign something *1117 in order to receive the cash value of a life insurance policy.[12] She had previously signed such paperwork in April 1993, eight months before the December 1993 meeting with Taunton, to receive the cash value of a $1,000 insurance policy. (C.R.296.)[13] The Parkers received $397 as a result of that transaction. The form Mr. Parker signed in January 1994, entitled "Application for Cash Surrender," instructed Mr. Parker that he would receive $141.17 in return for the surrender of the $500 policy. Although neither of the Parkers signed any other "Application for Cash Surrender" after the December meeting in 1993, they claim that they were expecting the "400 and something dollars" based on what they allege Taunton had told them in December 1993.
Mrs. Parker testified that the check for "400 and something dollars" did not come before Christmas and that she became concerned about when they would receive it. During January 1994, Taunton came to the Parkers' house to collect a premium. They asked him no questions about the check. Mr. Parker refused to pay the premium at that time.[14] As of November 1, 1993, the Parkers had allowed to lapse $2,000 worth of life insurance issued to them by Life of Georgia. Sometime during December, James Layson, Taunton's field manager at the Auburn office, telephoned Mr. Parker; there is also testimony that, at a time one cannot ascertain from the record, Mr. Parker telephoned Mr. Layson.[15] Layson explained to Mr. Parker the procedure for cashing in an *1118 insurance policy and confirmed that Mr. Parker did want to cash in the $500 policy. Layson also told him in a telephone conversation initiated by Mr. Parker that their cash value check was being processed. (R.T. 169, 173-75.) Mrs. Parker testified that she did not believe that she had any insurance in January 1994.[16] Her understanding was incorrect; the Parkers had a total of $4,000 in insurance ($2,000 each) as of January 13, 1994, and $1,608 in coverage even after they allowed the policy to lapse.[17]
When Taunton went to the Parkers' house to collect the January 1994 premium, Mr. Parker told him he did not have the money to pay the premium. (R.T. 116.) At that time, the policy had not yet lapsed. (R.T. 103.) Taunton told them that once they received the cash value check, they could use it to pay their premium. He told them to contact his wife, Kathy, at the Farmers Exchange Bank.[18]
Toward the end of January 1994, while they were driving, the Parkers passed Taunton, who, Mrs. Parker said, "waved them down." She said Taunton had Mr. Parker sign the cash value surrender application on his $500 policy. (R.T. 133.) Not long after that, the Parkers received the cash value check for $141.17. The Parkers did not attempt to contact Taunton, his wife, or Layson before or after cashing the check to ask why it was less than they had expected. (R.T. 150-51.) The check for $141.17 was the cash value of Mr. Parker's $500 policy, not for Mrs. Parker's policy. Mrs. Parker testified that instead of paying the January premium that was owed to Life of Georgia she held the *1119 check for a while, expecting Taunton to make another visit to her home, as had been the regular practice of previous agents of the Parkers.[19] When he did not come back or send another check, she cashed the $141.17 check. After the meeting between Taunton and the Parkers on the road in January 1994, Taunton did not return to the Parkers' house, because their insurance lapsed and their name was taken off Taunton's route list. (R.T. 191.) Mrs. Parker testified that when she received the check for less than the expected "400 and something dollars," she had a "sugar attack." (R.T. 136-37.)
It is undisputed that $141.17 was the correct cash surrender value of Mr. Parker's $500 insurance policy. It is also undisputed that each of the Parkers' insurance policies contained tables that, for each year that they owned them, showed the cash surrender value, i.e., the amount they would receive if they cashed the policy in. (C.R.223, 245, 254.) The Parkers eventually purchased insurance coverage with another insurance company in June 1994. (R.T. 136.)
Based on Life of Georgia's alleged misrepresentation, the Parkers claimed damages based on the loss of the full benefit of $4,000 of life insurance coverage (i.e., the $4,000 face amount), plus $500 for the loss of coverage under the $500 policy they cashed in,[20] and they claimed damages for the stress, anxiety, and mental anguish they claim to have suffered as a result of this dispute.
In addition to the allegations set out above, the plaintiffs further alleged fraudulent suppression of material information regarding the two $1,000 policies issued to them after the December 1993 meeting. The Parkers claim that Taunton failed to tell them that the policies were "modified death benefit" policies; the fact that the policies were modified-death-benefit policies meant that the face value of the policies would not reach the full $1,000 coverage amount until the beginning of the fourth year after the policies were issued. Mrs. Parker testified that she thought that the policies they purchased in the December meeting would entitle them to the full benefit of $1,000 if one of them were to die.[21] The Parkers claim that Taunton did not inform them that he was selling them this kind of policy. The two $1,000 insurance policies that Mrs. Parker had purchased in 1981 and 1987 were also modified- or graded-death-benefit policies. The record contains the policy schedules for the 1981 and 1987 policies purchased by Mrs. Parker (C.R.238, 267); on the first page of those policies the policies are clearly identified as "Graded Benefit Whole Life" policies, and each of those policies contains a chart of the benefits available.
Taunton claims he explained the kind of policies he was selling the Parkers. However, it is interesting to note that in Taunton's testimony, he seemed to assume that the words "modified death benefit" on the Parkers' applications for insurance were self-explanatory. Here is the exchange that occurred between Taunton and the Parkers' attorney at trial:
"Q. Now, let me ask you this. Is there anything on this document that says what you just told the jury? About, the first year you get so much, the second year you get so much, the third year it increases *1120 and the fourth year it increases until it gets to one thousand dollars. Is there anything on there that says that?
"A. Right here. Across the top it says: `Application for modified death benefit. Life Insurance Company of Georgia.'
"Q. Well, we understand that those words are there, but you just made an explanation of what those words mean to the jury. Is there anything on that paper that explains what modified death benefits is?
"A. No."
(Cross-examination of Taunton, R.T. 89.) Also, the figure in the blank for "amount applied for" is $1,000, with no other explanation on the application for what that means with respect to a modified-death-benefit policy.[22]
At least four separate writings, all in the possession of the Parkers, informed them about the details of the modified-death-benefit policy: (1) the insurance policy application that the Parkers each signed, which stated that each policy was a "modified death benefit" insurance policy that had an "ultimate benefit" of $1,000; (2) a written receipt given to the Parkers when they purchased the policies, which contained a table explaining the graded death benefit for each of the first four years of the policy (R.T. 204); (3) the policies that were in fact issued, outlining the exact benefits the Parkers would receive each year; and (4) the $1,000 policies from 1981 and 1987, each of which was a graded-death-benefit policy with an outline of how the graded death benefit worked for the first four years. All of this written information, as well as Taunton's testimony that he told the Parkers he was selling them a graded-death-benefits policy, supports the defendants' position that the details concerning the value of the policy were not fraudulently suppressed. According to Taunton's testimony, Mr. Parker's bad health at the time would have disqualified him for anything but a modified-death-benefit policy with Life of Georgia. (R.T. 86, 87.) In spite of this information that was available to the Parkers, the majority states that "the Parkers had little means of knowing" about the graded death benefits. 706 So.2d at 1112.

IV. Analysis
The majority ignores certain facts. First, its opinion provides no analysis of the fact that Mrs. Parker had purchased a graded- or modified-death-benefit policy before Taunton talked with her and Mr. Parker in 1993. The opinion makes passing mention of this fact in footnote 2, 706 So.2d at 1110, but it does not relate that fact to the question of what Mrs. Parker knew or should have known or whether Taunton was guilty of intentional suppression of a material fact. How could Life of Georgia have suppressed information in this particular sale, when that was the kind of policy the Parkers already owned? The majority mentions the fact that these policies would not have paid the full benefits if a policyholder died within the first year after purchase. The majority opinion notes that the policies were not "whole life" policies as if that phrase is significant.[23] It is not. The question is whether the policies would have paid full benefits the first year. The policies the Parkers purchased from Taunton would not have. However, the majority never addresses other inferences that arise from the fact that the Parkers had owned similar policies in the past. Nowhere does the majority's *1121 opinion address the question of what knowledge the Parkers had about the kind of policies they already owned or whether Taunton reasonably believed that if they had already owned a graded- or modified-death-benefit policy then they already knew what the term "modified death benefit" meant.
Second, the majority ignores the fact that the very first page of the policy schedule of the 1993 policies shows that accidental death benefits are available in the first three years; this fact partially compensates for the fact that the regular death benefits are below $1,000 the first three years. Third, the Parkers voluntarily stopped paying on their insurance policies, and allowed them to lapse. How can Life of Georgia be liable for that decision? Fourth, the Parkers received a check for $141.17. If they wanted a cash value check because they could not afford premiums (which is the reason Mr. Parker gave Taunton for not paying in January), why did they not use that check to pay the January premium? They received it after they told Taunton they did not have enough money to pay their insurance premium for January. If they were concerned about the amount of the check, why did they not contact the company and ask why the check was smaller than they had expected it to be? Of course, in that event the company would have explained the transaction and would have explained that it had been performed properly by Life of Georgia. Life of Georgia would have cleared up any misunderstanding created during the December meeting between the Parkers and Taunton. But if that had happened, the Parkers would have had very little evidence to support their claim that Life of Georgia is sufficiently culpable to deserve to pay punitive damages.
It is also unusual that Mr. Parker did not testify. Mrs. Parker was clearly confused about the transaction. If she and Mr. Parker had cashed in all their life insurance, they would have received much more than "400 and something dollars," but that decision would have been financially devastating for them. Taunton arranged a transaction for them that allowed them to obtain some cash and not pay an exorbitant amount in premiums. Mr. Parker was the center of most of the communications with Life of Georgia. Certainly, his testimony could have cleared up much of the misunderstanding. However, testimony that showed Mr. Parker understood more than his wife understood would not help to establish the plaintiffs' claims of misrepresentation and suppression. The record is devoid of any explanation as to why Mr. Parker did not testify in support of the plaintiffs' case, or why the defense did not call him as a witness.
I would affirm the compensatory judgment with regard to the misrepresentation and fraudulent suppression claims, but I would reverse the award of punitive damages. The plaintiffs did not offer convincing evidence to support the allegation that the defendants "consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff." That is the standard, required by Ala.Code 1975, § 6-11-20, for a plaintiff to be entitled to punitive damages.
Ala.Code 1975, § 6-5-101, defines "fraud":
"Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted upon by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud."
In order to prove fraud, a plaintiff has the burden of proving: (1) a misrepresentation of a material fact; (2) that the misrepresentation was made willfully to deceive, recklessly without knowledge, or mistakenly, and that it was acted on by the plaintiff; (3) that the plaintiff justifiably relied upon the misrepresentation,[24] given the circumstances; and (4) that the plaintiff incurred damage as a proximate consequence of the reliance. McGarry v. Flournoy, 624 So.2d 1359, 1361 (Ala.1993). If the evidence reasonably affords an inference that the plaintiff was defrauded by the misrepresentation, the case is one for the trier of fact. Baker v. Bennett, 603 So.2d 928, 935 (Ala.1992) (citing Hartselle Real Estate & Ins. Co. v. Atkins, 426 So.2d 451 (Ala.Civ.App.1983)).
*1122 The testimony is somewhat confusing as to just what was misrepresented and how the Parkers relied upon the misrepresentations. It is undisputed that as of January 13, 1994, the date the Parkers allowed their insurance to lapse, Life of Georgia had $2,000 worth of life insurance in force on Mr. Parker's life and $2,000 worth of insurance in force on Mrs. Parker's life. It is also undisputed that these amounts are the amounts of insurance coverage they expected Taunton to obtain for them after their December 1993 meeting with him. It is also undisputed that half of that coverage for each of them was based on the 1981 policies and half of it was based on the newly issued policies based on the December 1993 conversation with Taunton. Yet, Mrs. Parker testified that she thought they had no insurance at all at that time. In addition, Mrs. Parker said she thought that Taunton would "cash out" all their old policies, even though that would have resulted in the Parkers' paying a higher premium each month for the same amount of insurance. Taunton testified that he thought such a result would be of no benefit to the Parkers, that it would be cheating them. If Taunton had cashed in all their policies and issued two new $2,000 policies on their lives, he would have made more money in commissions. (R.T. 117.)
Part of the confusion stems from the fact that Mr. Parker did not testify at trial, even though he was apparently the only one who communicated with Life of Georgia after the December 1993 meeting with Taunton. For example, Mr. Layson testified that he contacted Mr. Parker by telephone in December to ascertain that Mr. Parker was sure he wanted to cash in his $500 policy. Mr. Layson testified that when he was asked by Mr. Parker when the Parkers would receive their check, he told Mr. Parker the paperwork was being processed. Also, when Taunton came to collect the insurance premium in January 1994, he spoke to Mr. Parker, who told him they did not have the money to pay yet. Mrs. Parker confirmed that that visit and that conversation occurred. Mrs. Parker was present later that month when Taunton had Mr. Parker sign the application for cash surrender value to cash in the $500 policy, but she claims not to have known what the paperwork was. Mrs. Parker could confirm that a telephone conversation occurred between Layson and Mr. Parker, that Taunton spoke to Mr. Parker about the premium that was due in January 1994, and that Taunton contacted the Parkers in January 1994 to get them to sign a piece of paper, but her testimony does not dispute what was actually communicated by Mr. Parker and Layson. Without Mr. Parker's testimony as to what transpired between him and Life of Georgia, the only evidence of the substance of those communications is the testimony of Layson and the testimony of Taunton; this fact makes their testimony regarding those particular conversations undisputed.
That testimony, as well as the documentary evidence, calls into question why Mrs. Parker would think she had no insurance at all with Life of Georgia. She testified that since age nine she had had insurance with Life of Georgia and that for many years she had done business with Life of Georgia. (R.T. 129-30.) No one had told her or Mr. Parker that they had no insurance coverage. Taunton attempted to collect their premium in January 1994 and even had Mr. Parker sign the cash surrender application at the end of January. If she was concerned about her coverage, she never attempted to contact Layson, Taunton, or Taunton's wife to ask questions. Based on the communications that Mr. Parker had with Life of Georgia, it is reasonable to believe that any misunderstanding Mrs. Parker had was based on communications (or the lack thereof) with her husband. Based on the evidence in the record, there appears no justification for Mrs. Parker to believe that she had no insurance. The evidence also draws into question the justification for the Parkers' voluntarily allowing their insurance to lapse as of January 13, 1994.
For the purpose of proving fraud, there are some questions the Parkers were required to answer. What material fact was falsely represented? Did Life of Georgia know that its representation was false or did it make the representation recklessly without knowledge? Did Life of Georgia mistakenly make a misrepresentation to the Parkers? Did the Parkers justifiably rely upon that false representation? Did the Parkers incur damage or harm as a result? As for the loss *1123 of the $4,000 coverage they had as of January 13, 1994, any loss of that coverage was due to Mr. Parker's voluntary nonpayment of the premium. All the information that had been provided to the Parkers as of the end of January 1994 indicated that Life of Georgia was their insurance company and that the insurance they had previously purchased was in force. In fact, the evidence showed that there still existed some insurance ($1,608) on their lives even after the policies had lapsed. How can this Court say that the Parkers justifiably relied upon a misrepresentation in allowing their insurance to lapse?
However, the evidence is disputed as to whether Taunton promised that the Parkers would receive a "400 and something dollars" check before Christmas. Construing the evidence in the light most favorable to the nonmovants, the Parkers, I must agree that there was evidence of a misrepresentation as to the amount of the check the Parkers could expect to receive. The testimony as to this matter is also somewhat confusing, however, because Mrs. Parker testified that Taunton said he would cash out all of their old policies. Accepting that as true, it is still problematic, because if Taunton had in fact cashed out all their policies, the Parkers would have received more than $800 in cash value.[25] Cashing in the $500 policy and either of the $1,000 policies purchased in 1981 by Mr. and Mrs. Parker would have resulted in a check equal to at least $400. In addition, cashing in all of the Parkers' old policies and issuing $2,000 worth of new insurance for each of them would have resulted in a higher premium for exactly the same coverage. The Parkers had already allowed $2,000 worth of insurance to lapse on November 1, 1993, just before the meeting with Taunton. Mr. Parker told Taunton that he did not have the money when Taunton came to collect the January 1994 premium for the insurance policies they still owned.
Taking into consideration all the testimony in this case, I consider it reasonable to believe Taunton's testimony that he did not want to increase their premium by issuing them totally new insurance. In essence, Taunton replaced the insurance that the Parkers had allowed to lapse in November 1993 and provided a means for them to pay the premiums on this insurance by advising them to cash in the $500 policy. Because they did not cash in more policies, the check the Parkers received at the end of January 1994 was for less than Mrs. Parker said the Parkers had expected.[26] There was a trade-off between (1) the Parkers' receiving a check for "400 and something dollars" and paying a higher premium and (2) the Parkers' receiving a check for $141.17 and paying a lower premium. Taunton's choosing of the latter, given the Parkers' inability to pay the premiums for all new insurance (and Mrs. Parker says she expected all the coverage to be new insurance) and Taunton's concern that they not pay more in premiums for the same amount of insurance, is what we should expect from an insurance agent who is looking out for his client. However, it is also the duty of an insurance agent to keep his clients informed of changes he intends to make in what they believe they have purchased. And Taunton apparently did not do this.
The Parkers presented evidence that they relied on an oral promise that they would receive a check for "400 and something dollars" and that each of them would have $2,000 in new insurance coverage. They presented evidence that in reliance on that promise they purchased new insurance; that purchase benefited Life of Georgia.[27] They in fact received the $2,000 in total insurance coverage promised on each of their lives, as a result of the method used by Taunton. *1124 Therefore, there was no misrepresentation as to that promise and no damage either. If the Parkers' claim is that they would not have purchased additional insurance but for Taunton's promise that they would receive the insurance coverage plus the check for "400 and something dollars," the only damage to the Parkers would have been the difference between the amount they thought they would receive as cash value"400 and something dollars"and the $141.17 they received.[28] The purchase of the added insurance caused no damage to them; they received what they had requestedthe total amount of insurance coverage they wanted to have in force on each of their lives after the transaction was $2,000. That is what they received. Whether the insurance coverage was new coverage or was not new coverage has no effect on the Parkers except for the amount of premium they would be required to pay.
Based on my review of the record, I conclude that the Parkers presented substantial evidence that Taunton, as an agent for Life of Georgia, mistakenly or recklessly misrepresented to Mrs. Parker that the cash value of Mr. Parker's $500 policy would be "400 and something dollars." The evidence of an intentional misrepresentation is lacking, because Taunton's decision not to cash in all the policies owned by the Parkers as of December 1993 resulted in less benefit to him than he would have received if he had taken what Mrs. Parker testified was the agreed course of action. If he had cashed in all their policies, the Parkers would in fact have received a check for more than $400. It is not reasonable to believe that he would intentionally misrepresent to the Parkers a fact that would provide less commission to him and that would result in a benefit to the Parkers (lower premiums). It is reasonable to infer from the evidence that Taunton simply was not careful enough in his explanation of what the Parkers would receive in cash value. It is also reasonable to infer that Taunton simply mistakenly, or incompletely, communicated with the Parkers. It is not reasonable to infer that Taunton intentionally misrepresented the amount of the cash value check the Parkers would receive.
What about the suppression claim? The elements of fraud based on suppression of material facts are (1) a duty on the part of the defendant to disclose facts, (2) the defendant's concealment or nondisclosure of material facts, (3) inducement of the plaintiff to act, and (4) action by the plaintiff, with resulting injury. Cato v. Lowder Realty Co., 630 So.2d 378 (Ala.1993).
If the Parkers' claim is that they did not receive the "full benefit" of the new $1,000 policies on each of their lives, then I think there exists substantial evidence to support that claim. The new policies issued to the Parkers by Life of Georgia in fact provided $1,000 in coverage on each of their lives. However, they were modified-death-benefit policies; the total paid out as a death benefit if either of the Parkers had died would not have equalled $1,000 until the end of the third year the policies were in force. Mrs. Parker had owned this kind of policy before. (C.R.255-56, 275-76, 292.) Because of their ages and their health, this was the only kind of policy Life of Georgia could issue to them. Mrs. Parker testified that Taunton did not explain that aspect of the policy, and, construing the evidence in the light most favorable to the nonmovants, we must accept her version of the meeting in December 1993.
At the signature line of the policy, the policy stated that it provided a "limited death benefit for the first three years." The receipt the agent gives to his clients upon their purchase of such a policy explains in a table exactly what the death benefit would be if the insured died in any of those early years of the policy. However, Mrs. Parker is blind, aged, and in poor health. Even in his testimony at trial, Taunton assumed that the trial *1125 court understood the meaning of the term "modified death benefit" printed at the top of the application. It is not unreasonable to impose on Taunton a duty to ensure that the elderly and blind Mrs. Parker understood exactly what she was purchasing.[29]
The record reveals a genuine issue of material fact as to whether the defendants fraudulently suppressed information that they should have relayed to the Parkers concerning the modified-death-benefit aspect of the policies. The Parkers presented substantial evidence that Taunton, without knowing whether Mrs. Parker understood how a modified- or graded-death-benefit life insurance policy would work, convinced her to purchase such a policy and that she would not have purchased such a policy if she had understood. She purchased a product that would not entitle her beneficiary to the full death benefit payment until after the third year. He knew her age and her poor health condition; therefore, in spite of all the reasons he may have had for believing that she knew what she was purchasing, he should have carefully explained to her the meaning of this policy. Viewing the evidence in the light most favorable to the Parkers, the nonmoving parties, I must conclude that they presented substantial evidence that Taunton and, through him, Life of Georgia suppressed information about the nature of the policies; that by doing so Taunton induced the Parkers to change their insurance; and that they were harmed as a result.
I think, however, that Taunton's misrepresentation did not rise to the level of willfulness, malice, oppression, or wantonness. By issuing the Parkers two new $1,000 policies rather than cashing in their old policies and issuing them two new $2,000 policies, the defendants actually chose a better course of action for the Parkers than the Parkers had originally chosen. Had the defendants chosen the method Mrs. Parker thought Taunton was pursuing, then the Parkers would have owed a higher premium than they had been paying for the policies they had purchased in 1981.[30] According to the testimony regarding the lapse of their insurance, they could not afford to pay a higher premium. Therefore, it was proper for Taunton to avoid an arrangement that would increase their premium to an even higher amount. Nevertheless, it is reasonable to infer that Taunton, as an agent for Life of Georgia, suppressed a material fact that he was under an obligation to communicate to Mrs. Parker and that he did so in order to write new insurance on her life. Again, because Mr. Parker did not testify, we do not know if he understood the nature of a modified-death-benefit life insurance policy. It is also reasonable to infer that Taunton's actions were unintentional, because the Parkers had a history of purchasing this kind of insurance and had abundant documentation of what they had purchased through Taunton.

V. Did the evidence submitted at trial support the jury's verdict and punitive damages award?
According to Ala.Code 1975, § 6-11-20, punitive damages may not be awarded except upon "clear and convincing evidence" of the extreme misconduct outlined in the statute:

*1126 "(a) Punitive damages may not be awarded in any civil action, except civil actions for wrongful death pursuant to Sections 6-5-391 and 6-5-410, other than in a tort action where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff. Nothing contained in this article is to be construed as creating any claim for punitive damages which is not now present under the law of the State of Alabama."
This Court is obligated to review the question whether the Parkers produced "clear and convincing evidence" that Taunton or Life of Georgia acted in a way that would justify the award of punitive damages under this statute. However, the majority opinion does not even mention the requirements of this statute.
The Parkers did not produce "clear and convincing evidence" entitling them to punitive damages on their claim of intentional misrepresentation. The evidence shows that Taunton's actions were meant, at least in some respect, to benefit the Parkers. By canceling the $500 policy and issuing two new $1,000 policies, rather than canceling all of the Parkers' existing policies and issuing two new $2,000 policies, Taunton received a smaller commission than he otherwise would have received. His actions also meant less premium money for Life of Georgia. Some of the evidence showed that the way Taunton handled the transaction saved the Parkers money. By not issuing new policies to the Parkers, who were older and in worse health than when the original $1,000 policies were issued, Taunton saved the Parkers money in insurance premiums. The evidence did not clearly and convincingly indicate that Taunton or Life of Georgia "consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff[s]." Thus, I would hold that the punitive damages award on the plaintiffs' claim of misrepresentation is not supported by the evidence.
With regard to the claims of fraudulent suppression, I would also hold that the evidence does not support an award of punitive damages under the "clear and convincing" standard. The evidence supporting the jury's finding that the defendants suppressed information regarding the graded-death-benefits policy does not support a punitive damages award. While one can infer from the testimony that Taunton did not orally inform the Parkers of the fact that the policies they were buying would not fully mature for three years, the written information given to the Parkers clearly informed them of this fact. The Parkers had purchased modified-death-benefit policies before. Thus, it is reasonable to infer that the defendants did not act maliciously in selling them this kind of policy. Also, because of their poor health and their advanced age, the plaintiffs could not have purchased a full-benefits policy even if they had wanted to. The Parkers qualified only for a modified-death-benefit policy. It is conceivable that Taunton was trying to influence the Parkers to purchase the modified-death-benefit policy by suppressing the information about the manner in which the death benefit was paid out for the first three years and misrepresenting the amount the Parkers would receive for cashing in their policies. However, the evidence of such a scheme is far from clear and convincing. In fact, the evidence is quite unconvincing.
The standard is "clear and convincing evidence." I would hold that, as a matter of law, the Parkers did not present clear and convincing evidence on the kind of conduct § 6-11-20 would require for an award of punitive damages.

VI. Was the award of punitive damages unconstitutionally high in comparison to the compensatory damages awarded?
This Court should not need to answer this question, because the Parkers did not even meet the standard for proving that punitive damages were appropriate in the first place. The punitive damages award should be reduced to zero. However, I concur with the majority's decision to remand for a Hammond hearing on the question of punitive damages.

VII. Conclusion
I would affirm the award of compensatory damages based on the claims of misrepresentation *1127 and fraudulent suppression, but I would reverse the award of punitive damages. I do not think the plaintiffs provided the clear and convincing evidence necessary to support an award of punitive damages.
SEE, J., concurs.
NOTES
[1] Rule 50, Ala. R. Civ. P., as amended effective October 1, 1995, renames the "motion for a directed verdict" a "motion for a judgment as a matter of law," and renames a "motion for a judgment notwithstanding the verdict" a "renewal of the motion for a judgment as a matter of law." The standard of review for a motion for a judgment as a matter of law is the same as for a motion for a directed verdict and a motion for a JNOV.
[2] The Parkers had also purchased two $1,000 policies in 1987, but they had cashed in those policies in April 1993.
[3] James Parker's $1,000 and $500 policies were whole-life policies. Rosie Parker's $1,000 policy was a matured graded-death-benefit policy that would pay its full face value at her death.
[4] The complaint in this case was filed before this Court issued its opinion in Foremost Ins. Co. v. Parham, 693 So.2d 409 (Ala.1997), which overruled Hickox v. Stover, 551 So.2d 259 (Ala.1989). That Foremost Ins. Co. opinion replaced the "justifiable reliance standard" in fraud cases with the "reasonable reliance standard."
[5] The record shows that if an insured cashes in a policy, or allows it to lapse, an agent who rewrites insurance for that insured will earn a commission only if the premium for the new policy is greater than that of the previous policy. Under this rule, Taunton, in effect, received a commission only upon the $1,000 policy that he sold Rosie Parker.
[6] Layson testified:

"A. Life of Georgia has what they call a rewrite rule. Which means, if a person CSV's, cashes in or lapses a policy, if you rewrite that person within six months, from the time the cash value went in, or the policy lapsed, the only commissions you will be paid on, are commissions above whatever that premium was that you lost. So, for instance, if they lapsed or cashed in a $20 a month premium well, I'll just use the example we have here. They lapsed a $27.72 premium on James Parker. Mark [Taunton] sold him a $15.29 premium. Mark made zero on it. The only way he could have made money would have been to have sold him a bigger policy to where the new premium would have been more than $27.72 a month. Then he would only make commission on the difference. So, the company has a vehicle in force to discourage that practice from happening. It would have been to Mark's advantage, to sell the 2,000 on each of them."
(R.T. 195-96.)
[7] Mrs. Parker testified:

"Q. What did you understand when he said it was going to be a $2,000 policy?
"A. I thought I was going to cash all the policies out and return some money and join another one. But he didn't explain nothing to me. That was my thoughts.
"Q. Were you supposed to get a $2,000 policy for you and one for your husband too?
"A. Yes.... But I hadn't received not a one."
(Emphasis added.) (R.T. 131-32.)
[8] Mr. Parker's policy chart shows those two amounts as the minimum and maximum amounts they could receive, based on the number of years they had owned the policy.
[9] Life of Georgia produced a status-of-coverage letter dated June 25, 1994, which indicated that the two new $1,000 policies for Mr. and Mrs. Parker were effective as of December 13, 1993.
[10] Taunton testified:

"[I]f I had cashed in the 1,000 [the 1981 policy on Mr. Parker's life], it would be like Mr. Parker being a brand new customer with the company. He would be, like starting all over again. Plus, the premium at his older age would have been a lot higher than it would have been. He couldn't have bought another $1,000 policy for the same premium he was paying for the one he bought in '81 because he was a lot older." (R.T. 114-15.)
He also testified:
"[I]t would have been doing them a misjustice. Because it wouldn't have been benefiting the Parkers. They would have been paying me more money each month for the same amount of $2,000 insurance. It wouldn't have been doing them no justice." (R.T. 118.)
[11] That application form appears in the clerk's record at page 225.

Mrs. Parker was questioned about the exchange on the road in January 1994 between Mr. Parker and Taunton:
"Q: Now, Mrs. Parker, did Mr. Taunton present you with any documents for you to sign or to read [in the December meeting]?
"A: No, because I couldn't read. But, he met us, we were coming to town one day.
That was in January. He met us on the road, he waved us down, and handed my husband a paper and said, sign this. And then my husband signed it and he took off. And I hadn't seen him since."
(R.T. 133.)
It is not clear why Taunton had Mr. Parker sign a cash surrender application in late January 1994. Layson, Taunton's field manager at the Auburn office, was under the impression that an application had already been filed with his office for the Parkers, which would have explained why Layson telephoned Mr. Parker to ensure that he wanted to cash in the policy. (R.T. 173-76.)
[12] She testified:

"Q. And, each time he [the Parkers' former Life of Georgia insurance agent] did that [cashed in a policy for Mrs. Parker], as you did later on, he would have you sign something and you would have to give him the policy, right?
"A. When I asked him to cash it out, and I would sign it, then he would ask me for the policy.
"Q. All right. But you knew you had to sign something whenever you cashed one out; is that right?
"A. That's right."
(Cross-examination of Mrs. Parker, R.T. 149.)
[13] Mrs. Parker also testified that in April 1993 she had turned in her insurance policy to the agent in order to receive the cash value. She testified that she did not turn in her policy to Taunton in December 1993.
[14] Mrs. Parker testified: "[Mr. Parker] told [Taunton] he hadn't got no money." (Testimony of Mrs. Parker, R.T. 134.)
[15] Mrs. Parker testified that her husband telephoned Layson, who was Taunton's supervisor and the field manager at Life of Georgia's office in Auburn, to ask about their check:

"Q. Did you make any kind of attempt to contact [Taunton] or anybody else at Life of Georgia?
"A. My husband called the field manager and talked with him. And he said
"[DEFENSE COUNSEL:] Objection.
"[COURT:] Sustained.
"Q. Did your husband call him on the telephone?
"A. Yes.
"Q. But you're saying there was an attempt to contact the company.
"A. Yes.
"Q. Did the company respond to you?
"A. Mr. James, I think is his name, he said
"Q. No, don't tell me what he said. Don't tell me what he said. He didn't talk to you; did he?
"A. No."
(R.T. 137-38.) Mrs. Parker did not talk to Layson, and Mr. Parker did not testify; therefore, we have no evidence from the plaintiffs as to what was said in that telephone conversation, nor is it clear when the conversation occurred.
Layson testified that he telephoned Mr. Parker as a matter of company policy, to make sure that Mr. Parker was certain that he wanted to cash in his $500 policy:
"I just wanted to make sure that he understood that he was cashing in a policy that was older than what he was taking out. In other words, he couldn't buy it again at that age. And I just followed up and asked him did he understand what he was doing. And he told me that he needed to get a hold of some money and that's why he was cashing it in. And that call was made to his home.... I know it wasn't in January. It was in December. I would say, probably the first two weeks of December."
(R.T. 169, 170.)
(Footnote cont'd.)
Layson testified that he talked with Mr. Parker twice:
"A. I talked with Mr. Parker twice. I talked with him the first time concerning whether or not he understood what he was doing with his insurance. I talked with him another time, how long after that I do not know. One other time he was concerned about why he had not received his cash value check. That's the only two times I talked to him during that time.
"Q. Now, who initiated that conversation?
"A. The conversation about the cash value check, Mr. Parker called the office.
"Q. He called your office and asked you where his money was; is that right?
"A. That's correct.
"Q. What did you tell him?
"A. I told him it was being processed.
"Q. Did you and he have a conversation about the amount of money that was being processed?
"A. No, we didn't.
"Q. Did he indicate to you the amount of money he was expecting?
"A. No, he didn't.
"Q. Was this conversation you haddid he register with you some concern or some complaint about not having received this money earlier?
"A. He called because he was concerned that he had not received the money."
(R.T. 173-74.)
The only evidence as to when these conversations occurred comes in Layson's testimony; he said the first conversation occurred before the Parkers received the check for $141.17.
[16] On direct examination, Mrs. Parker testified as follows:

"Q: Did you have any insurance after January of 1994?
"A: No. Later on in June, I joined another policy.
"Q: With another company?
"A: Yes.
"Q: So, you were without insurance in January of 1994; is that right?
"A: Yes.
"Q: You were not covered by this policy?
"A: No.
"Q: That Mr. Taunton promised you.
"A: That's right."
(R.T. 136.)
[17] According to the documentation in the record, at the time the Parkers allowed coverage to lapse they actually had $4,000 of life insurance. Even after the Parkers ceased paying their premiums and the policy lapsed as of January 13, 1994, a total of $1,608 worth of life insurance was still in effect on the Parkers' lives. Without payment of any premiums, the extended term insurance on Mr. Parker's life remained in effect until December 8, 1999. The $608 worth of reduced paid up life insurance on Mrs. Parker's life was still in effect after the lapse. (C.R.236.)
[18] Mrs. Parker testified:

"Q. Did [Taunton] come to your house in January [1994] to collect any type of premiums?
"A. My husband said he did. I was back in the back. [My husband] told him he hadn't got no money. [Taunton] just took off. He said, `If you get any money or you get a check, you call Kathy.' Who was Kathy, I don't know, he said she was his wife. That she worked at the Exchange Bank. To let her know. He said, `If you get a check don't cash it,' turn it over to him. That's what he said."
(R.T. 134.)
[19] Mrs. Parker stated that she "held [the check] a while but [Taunton] didn't come back. I thought he was going to come back for another monthly premium but he never did. So I spent it." (R.T. 135-36.)
[20] The Parkers claim that they cashed in the $500 policy because they had been told that they would receive "400 and something dollars" for it. Consequently, their claim is for the period that they were without the $500 coverage.
[21] Mrs. Parker testified as follows:

"Q: Did [Mr. Taunton] explain to you anything about a policy that would increase over time?
"A: No.
"Q: Would you have bought a policy that would increase over time?
"A: No. Because I thought when you joined a policy, and received your policy, you are paid for everything. You get the whole benefit.
"Q: So, it was never your intention to buy a policy that would only have a face value after four [sic] years?
"A: No. I didn't know it."
(R.T. 139-40.) The first thing the reader sees in the center of the first page of the policy schedule for these policies is the chart showing the amount that would be paid in any particular year to the beneficiary. That chart takes up almost half the page and is clearly understandable to a person with a sixth-grade education.
[22] Because it contains the chart of payments for the first four years of the policy, the first page of the policy schedule is important. Nowhere on that page are the words "modified death benefit." The modified or graded benefits, however, are clearly explained in two locations, at the center of the page and at the bottom.
[23] The majority states: "The Parkers agreed that they wanted to have $2,000 apiece in death benefits and, believing that they were buying whole-life policies, signed the applications for the new policies." 706 So.2d at 1111.

The significance of the 1981 and 1987 policies is threefold: One, they were over four years old; therefore, any new graded-death-benefit policy sold in exchange for any of those policies by Taunton would not for three years equal the death benefits that would have been available from the 1981 and 1987 policies. Two, the fact that the Parkers had those policies is evidence that the Parkers did know or should have known what they were purchasing from Taunton in 1993. Three, the fact that the Parkers had those policies is evidence that Taunton was not so culpable in not explaining the meaning of the term "modified death benefit."
[24] See note 4 of the majority opinion, 706 So.2d at 1113.
[25] Adding up the cash value of all the insurance policies owned by the Parkers as of the time of the December 1993 meeting with Taunton gives a minimum of $806.17a minimum of $278 for Mr. Parker's 1981 policy, a minimum of $387 for Mrs. Parker's 1981 policy, and $141.17 for Mr. Parker's $500 policy.
[26] We do not know what Mr. Parker expected, because he did not testify.
[27] The Parkers' purchase also benefited Taunton minimally. Because Mr. Parker's insurance coverage increased so little (from $1,500 to $2,000), Taunton received no commission for obtaining that additional insurance for him. Mrs. Parker's increase (from $1,000 to $2,000) would have provided a small commission for Taunton.
[28] It could be argued that we should factor into the calculation the savings in premium payments the Parkers would have because of Taunton's method of obtaining the $2,000 in insurance coverage on each of their lives compared to the premium the Parkers would have paid if Taunton had done what Mrs. Parker said she understood he was going to do. However, that would require a calculation of the total savings during their expected life spans, discounted over time. No evidence of this amount was presented in the trial court. In addition, the Parkers' ages indicate that that amount would probably be quite minimal.
[29] While Mrs. Parker did not receive exactly what she thought she had purchased, she received more than she had owned previously. Her 1981 $1,000 policy was still in force at the time of the meeting with Taunton, and the modified-death-benefit policy provided for a death benefit that increased each year until the payment reached $1,000 the fourth year. Mr. Parker's situation is different. If he had died during the first year after the new policy became effective, then Mrs. Parker, his beneficiary, would have received only $1,189 ($1,000 from the 1981 policy and $189 from the new modified-death-benefit policy). That amount is less than the $1,500 she would have received if he had died the year before, when his $500 policy still would have been in force. We do not know what Mr. Parker thought he had purchased, after the meeting with Taunton, because he did not testify. Therefore, there is no evidence in the record that he did not receive what he had bargained for.
[30] The 1981 policies had been in effect for over 12 years. In 1993, Mr. Parker was 68 years old and was in poor health, and Mrs. Parker was 70 years old and was in poor health. Insurance companies compute premium payments based primarily on age. A difference of 12 years, taken with the Parkers' being over 65 years old, would surely have increased drastically the premiums the Parkers would have had to pay for new policies.